## THE H. S. NICHOLS.[1]

## THE CERES.

## THE G. W. WRIGHT.

## THE JAMES T. EASTON.

## DU BOIS v. THE H. S. NICHOLS and THE CERES.

## SAME v. THE G. W. WRIGHT and THE JAMES T. EASTON.

(District Court, S. D. New York. January 4, 1893.)

1. COLLISION WITH WRECK—NEGLIGENCE—PILOT—IGNORANCE OF CHANNEL.

The tug Ceres, in taking a mud scow to sea from New York harbor by Coney island channel, ran the scow aground. Thereafter the tug Nichols, passing through the channel with libelant's scow No. 3 in tow, ran No. 3 upon the stranded scow of the Ceres with such force as to cause No. 3 to sink. The owners of the Nichols sent the tug Wright to stand by No. 3 during the night and warn other vessels of the wreck, but in spite of the presence of the latter tug, with two red lights set, the tug Easton came down the channel, and ran her tow upon the sunken No. 3, inflicting on it further damages. The owner of No. 3 brought these suits against all four of the tugs, alleging negligence in their failure to give proper signals on the part of the Ceres and the Wright, and negligence in failing to observe and keep out of the way of the grounded scows on the part of the Nichols and the Easton. *Held,* that questions as to lights and signals were immaterial, as the Ceres and the Wright gave signals which were sufficient to warn an approaching vessel of some danger, and that the fundamental cause of the collision was a lack of knowledge of the true channel, and the proper way of navigating through it, on the part of the masters of the Nichols and the Easton, which rendered those tugs alone liable for the damages.

2. SAME—COLLISION WITH WRECK—SIGNALS REQUIRED.

In a dangerous place, some notice of the presence of a wreck is a reasonable obligation on the part of the owner of such wreck; but, no special signals being prescribed, any plain signals that naturally serve as a warning to keep off are sufficient.

[1] Reported by E. G. Benedict, Esq., of the New York bar.

In Admiralty. These were two libels by Jacob Du Bois, as owner of scow No. 3, against the steam tug H. S. Nichols and the steam tug Ceres, in the one case, and against the steam tug G. W. Wright and the tug James T. Easton, in the other. Decree for libelant against the Nichols and the Easton, and exempting the Ceres and the Wright.

Goodrich, Deady & Goodrich, for libelant.

Peter S. Carter, for the Nichols and the Wright.

Stewart & Macklin, for the Ceres.

Hyland & Zabriskie, for the Easton.

BROWN, District Judge. The libelant is the owner of scow No. 3 which was employed in taking mud from New York to and beyond Sandy Hook, to be dumped within the prescribed limits. Like other scows in this service, she had no motive power of her own, but was towed with two other scows behind her by a tug upon a hawser about 400 or 500 feet long, the two scows behind No. 3 being connected closely together by a short hawser. Quite a number of scows and tugs are in this service. They draw from 7 to 12 feet. The usual route lies through the Coney island channel, a passage which appears from the chart to give 10 feet depth of water at low tide for a breadth of at least 1,000 feet at its narrowest part abreast of Lewis' shoal, but which the witnesses have supposed to be considerably less.

The ordinary practice for tugs going down is, to pass near the light on Norton's point, the westerly end of Coney island, thence to go about half a mile on a S. S. E. course, and then to haul around to about E. by N. The narrowest part of the channel is met soon after hauling upon the last-named course, where it runs between the east bank on the south and Lewis' shoal, or spit, on the north. The usual navigation brings the tows down to this vicinity in the last quarter of the ebb tide; and the evidence shows that the grounding of tugs for a few hours at this part of the channel way is not infrequent. Several tugs, each with two or three scows in tow, usually go down with every ebb tide night and day.

At about 1 o'clock A. M. on September 7th, 1892, the libelant's scow No. 3, loaded with mud, and drawing 7½ feet of water, while going past Lewis' shoal in tow of the steam tug H. S. Nichols, was pulled head on against the stern of another scow which had got aground opposite Lewis' shoal on the east bank, while in tow of the tug Ceres, which had gone down not long before. Still another scow was at the same time aground on Lewis' shoal oppposite. The captain of the Nichols testifies that on approaching these two scows aground, he supposed them both to be upon Lewis' shoal, i. e. to the northward of the channel, and that he, therefore, attempted to pass to the southward of the scow of the Ceres; in doing so, he pulled No. 3 against the latter scow with sufficient force to break the bow of No. 3, and to cause her to sink in a few minutes. The first above libel is filed to recover the damage from that collision.

Before sinking, the stern of No. 3 swung around to the northward and eastward, and the two scows No. 6 and 11 which were behind No. 3, also drifted away to the northward and eastward, passing the sunken scow on her northerly side while the Nichols went on her

southerly side. No. 3 soon sank in a position heading about S. W., her bow at low tide being in about 7 or 8 feet of water, and her stern in 10 or 12 feet.

For the purpose both of protecting the scow from further injury and of avoiding collision with other tugs and tows that were passing day and night, her owners sent the Ariosa to look after her during the daytime of September 7th, and requested the agent of the Nichols to look out for her. The latter on the night of the 7th sent the tug Wright, which went down and took the position previously held by the Ariosa near the sunken scow, and remained there during the night. She made fast by the Ariosa's anchor, which had been dropped in one of the scow's four mud wells, probably in the well nearest to the channel as she lay. Between 1 and 2 o'clock that night the tug Easton, coming down with similar scows in tow, in attempting to go to the southward of the sunken scow No. 3, ran her head scow against the southerly side and corner of No. 3, and caused her further damage, for which the second above libel was filed.

The principal facts charged against the Nichols and the Ceres in the first libel are, that the Nichols was the overtaking vessel and did not keep out of the way as she should have done, nor observe that the Ceres' scow was aground; and that the Ceres did not give signals of danger, as she ought to have done. In the second libel, the faults charged are that the Wright did not give any proper signals by whistles to warn other vessels away, nor show any white light to indicate that she was at anchor; and that the Easton did not keep a proper lookout, nor keep out of the way.

There is the usual discrepancy in the testimony. Much of the testimony is, I am persuaded, incorrect, especially as to the width of the channel, and the direction of the ebb tide in the last quarter. The narrowest part of the channel way between the east bank and Lewis' shoal exceeds, I think, the largest estimate given. Considerable of the testimony, also, which conveys the impression of a difficulty in navigating through that channel in consequence of an alleged strong set of the tide across the channel course towards the east bank, and as to its rate, is, I am also satisfied, mistaken or very greatly exaggerated. The evidence shows that the tugs while lying there at anchor on the ebb, lay very nearly in line with the Coney island shore; that when the Nichols and the Easton attempted to go to the southward, i. e. upon the edge of the east bank, both of their tows, some 400 or 500 feet distant, went more to the northward than the tugs, instead of drifting more to the southward, as the alleged tideway would have caused them to do; and after collision they all cleared by swinging and drifting to the northerly side of the scow aground instead of to the southward, and continued drifting in the same direction.

Both of these collisions were manifestly caused by the same mistake of attempting to go to the southward of the scow aground or sunken; and both, I am satisfied, happened because neither the captain of the Nichols, nor the captain of the Easton was sufficiently acquainted with the location of the channel, nor with the proper way of navigating through it. Both were comparatively young men. The

answer of the Easton alleges that she went as near to the east bank as possible; and the testimony of the captain of the Nichols shows that he supposed that the scow of the Ceres was upon the north side of the channel way, instead of on the south side of it. This same mistake by both, was the real cause of both collisions. The captain of another tug, the Decatur, twice made a similar mistake. No persons from the Decatur were called as witnesses. The pilots of the other tugs going up and down, who knew the channel way better, had no difficulty in keeping away both from the Ceres' scow, and from No. 3 by a good distance. They passed well clear to the northward, where there was in fact abundant room for them to go, and to go without difficulty. It was only those who did not know the channel way and who tried to find a channel over the east bank, that got into trouble.

Upon this view of the fundamental cause of the collision, it is not important to consider at any length what has mostly occupied court and counsel upon the trial and the argument; namely, the particular signals given or omitted by either, or the lights displayed. These were all immaterial. The evidence is overwhelming that the night was a bright, moonlight night. I am obliged to discredit the evidence of the Easton on this point. The Nichols, on approaching the Ceres' tow, had the proper channel course been known to her captain, and had any proper lookout been kept, would have had no trouble in going to the northward where there was abundant breadth of deep water, and no difficulty from the tide. The Ceres' scow was stationary; the Ceres was trying to move her and their positions were perfectly discernible from a quarter of a mile to a half mile distant. There were lights upon both and there was no need of any further signals to an approaching tug to keep away; nor any difficulty in doing so to a pilot knowing the channel; nor did any rule or regulation require any further lights or signals.

So as respects the collision on the following night, the same remarks apply. No special signals, lights, or whistles were required by any rule or regulation. In a dangerous place, notice of some kind is a reasonable obligation; but any signal that naturally serves as a sufficient warning to keep off, according to the circumstances, is enough. For an anchor, dropped where it is likely to cause injury to other vessels, a buoy is enough; and a wreck, or a vessel aground, in the absence of any rule on the subject, is sufficiently notified to approaching vessels by any unusual signal calculated to arrest attention and to give warning. In this instance, two red lights, plainly a warning signal, were displayed from the tug Wright, which was at anchor by the wreck, to cover her. She was on the south edge of the channel, and the two red lights were a signal not appropriated to any other use; and in that special situation where the liability of boats to get aground was known, such a signal would necessarily suggest either a grounding or a wreck of some boat there. The defense of the Easton is, not that such signal lights were not understood, but that only one red light was visible, and a white light, instead of two red lights. I cannot accept her version on this point any more than in regard to her testimony as to the darkness of the night. The proof

is abundant that both red lights were set and were visible. To the claim that the Wright was mistaken for some light-draft sailing vessel in that locality, I attach no weight. The signals of the Wright were sufficient; they were visible at a long distance; and the Easton was bound to avoid the danger indicated by going in the proper channel to the northward a reasonably safe distance away. The cause of the collision was that the Easton did not heed the two red lights of the Wright in time, and because her pilot, being ignorant of the true location of the channel, took the unjustifiable course to the southward.

Decree for the libelant against the Nichols and the Easton, and exempting the Ceres and the Wright.