## THE NATHAN HALE.

(Circuit Court of Appeals, Second Circuit. January 9, 1900.)

### No. 81.

Tugs—Injury to Tow—Negligence.

A barge in tow drawing 24 feet of water, proceeding along and a little to the west of the middle of a passage 1¼ miles long and ¾ of a mile wide, when about halfway through struck on the most easterly boulder, 19 feet below the surface, in a shoal commencing 750 yards from the easterly side of the channel, at a point where it was 1,300 yards wide. The shoal was not known to navigators. The government charts showed at this point, midway between the shores, a channel one-quarter of a mile, in which the water was nowhere less than 26 feet deep; and the Atlantic Coast Pilot described the channel as well buoyed, and therefore particularly safe, and directed that it be entered "about midway" between the shores. At the time of the accident the masters of the vessels supposed they were about the middle of the channel. The shoal contained a number of rocks less than 21 feet below the surface, which were surrounded by, and had between them, water 27 feet deep. *Held* that, in the absence of evidence that the tug went out of the channel usually pursued by navigators, it was not liable.

Appeal from the District Court of the United States for the Southern District of New York.

Samuel Park, for appellant.

H. Galbraith Ward, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. While the steam tug Nathan Hale was towing the barge Felix from New Bedford to Vineyard Haven, in August, 1897, she proceeded through Quick's Hole, a channel between Nashawena Island on the west, and Pasque Island on the east, leading from Buzzard's Bay to Vineyard Sound. The barge was on a hawser of about 900 feet, was loaded with coal, and drew about 22 feet of water. In passing through the channel, the barge was so badly injured by striking upon a rock that she shortly afterwards sank. The action was brought to recover of the tug the damages arising from the disaster, upon the theory that the tug was negligent in performing the towage service. Of the specific allegations of negligence set forth, two only are now material—First, that the tug was negligent in towing a barge drawing so much water through Quick's Hole, instead of taking a route to the westward of Cuttyhunk Island; second, that the tug was negligent in not keeping the barge in the channel.

The court below found that Quick's Hole had been the usual and customary passage for many years for coal barges drawing as much as 24 feet of water, and that no fault was to be imputed to the tug for proceeding with the barge through that channel; but also found that the tug was negligent in taking her tow too far on the westerly side of the channel, instead of keeping to the middle, or the easterly side of the middle, and on that ground condemned the tug for the loss. 91 Fed. 682.

Quick's Hole is about one and one-quarter miles from mouth to mouth, and varies in width from about three-quarters of a mile to about a mile. Its course is approximately north and south. About midway between the north and south entrances, and on the easterly side of the channel, about one-third of the distance from shore to shore, is buoy No. 2. About 500 yards northwesterly from this buoy is a shoal which extends towards the westerly shore, and upon the easterly ledge of this shoal are rocks which are less than 22 feet below water. This shoal was not denoted on the government charts, and, according to the last chart published before the disaster to the Felix, the water there was from 27 to 44 feet deep. About 600 or 700 yards to the southwesterly of this buoy is a shoal of rock known in the case as "21." It is so far out from the western shore, and approaches so near the middle of the channel, that the proper navigation for vessels passing through Quick's Hole from the northward requires a change of course to the easterly after passing buoy No. 2. The sailing directions in the Atlantic Coast Pilot, in proceeding from Buzzard's Bay to Vineyard Sound, are as follows:

"Passing through from the northward, when Quick's Hole is opened so that Gay Head can be seen, steer to the southward so as to enter the passage about midway between Pasque and Nashawena Islands; thence steer for Gay Head, taking a course to leave red buoy No. 2 on the port bow. Leave this buoy on the port hand, and steer S. S. E. into Vineyard Sound, leaving black buoy No. 1 upon the starboard hand."

The Atlantic Coast Pilot describes Quick's Hole as "a passage three-quarters of a mile wide, from five to eight fathoms of water separating the islands, and well buoyed, and therefore perfectly safe for strangers." In 1887 the United States government caused a hydrographic survey of Quick's Hole to be made, the work occupying 10 days or a fortnight, and the maps which had been published prior to the disaster correctly expressed the results of that survey. The officer who had charge of the survey testifies that the east shore is a particularly rocky and dangerous shore, but the west shore is sandy, with bold water close up to the beach in places, and is not a dangerous shore, apparently, to approach. According to the government charts, from the northerly mouth of the passage to the southwesterly shoal, there was, midway between the shores of the two islands, a channel a quarter of a mile in width, in which the water was 26 feet deep at the shallowest point.

As the vessels were about to enter the mouth of the channel, a squall, with fog, came up, and they turned about under a port helm. When the fog lifted, and this maneuver was completed, they were headed somewhat to the westerly of their original heading, and

thus they entered the channel somewhat to the westerly of the middle. They had proceeded about three-fourths of a mile, the tug having passed buoy No. 2 about 600 feet on the port hand, when the barge signaled for help, and it was discovered that she was making water very fast. None of those in charge of the navigation of either vessel were aware that the barge had struck a rock, and, upon an examination of the government chart, it was assumed by both masters that she must have struck a sunken wreck or some unknown obstruction. The master of the tug was an experienced pilot, and was familiar with the passage, having taken both tows and sailing vessels through it many times. The master of the barge had been through it on one occasion before, with a vessel drawing 22 feet of water. The existence of the northwesterly shoal was not known to navigators, as appears by the unanimous testimony of the many pilots living in the vicinity of Quick's Hole, or accustomed to take vessels to and from Vineyard Sound; and, so far as it appears, it was known to only two persons living in that vicinity, men resorting there to fish, and who for selfish reasons had not disclosed its existence to any one else. The evidence makes it entirely clear that the barge struck a rock upon that shoal, and the court below so found. By surveys subsequently made, it appears that the shoal is a ledge of boulders commencing at a point about 750 yards distant from the easterly shore of the channel, running in a northwesterly direction a distance of approximately 500 feet, having a width of about 200 feet, and containing a number of rocks less than 21 feet below the water. It is surrounded by water of a depth of about 27 feet, and between the rocks there is water of that depth. At the eastern extremity of the shoal are three boulders having only about 19 feet of water over them, the most easterly being about 10 yards westerly from the eastern extremity of the shoal, and the other two being about 40 yards further west. The channel at that point, from shore to shore, is about 1,300 yards wide. According to the testimony of her master, the course of the vessel through the channel was not far to the westward of the middle of the channel from shore to shore. It is fair to assume, therefore, that the barge struck upon the most easterly boulder.

In performing the towage service, the tug was not an insurer, nor bound to exercise the highest degree of skill and prudence, but it was her duty to exercise the degree which would have been exercised by prudent and experienced navigators familiar with the conditions incident to that particular voyage. Navigators are ordinarily justified in relying upon the charts provided for their information by the government, and ought not to be deemed negligent in doing so, in the absence of circumstances known, or which ought to be known, discrediting the accuracy of the charts. Negligence ought not to be imputed to the tug upon this occasion merely because she did not go exactly in the middle of the channel. A deviation of 330 feet from midway in a passage three-quarters of a mile wide is an inconsiderable one. Distances over water, when there are no artificial or natural monuments to assist in estimating them, especially when considerable, can only be estimated approximately, and

the varying judgments of nautical men of equal experience and opportunity for observation in respect to them is illustrated daily in collision causes.

According to the testimony of the master of the tug, and also of the master of the barge, the vessels were supposed to be in about the middle of the passage, and, had it not been proved otherwise by the result, it could not be found upon proofs that there was any observable deviation. If the tug entered the passage "about midway," or approximately, she conformed to the sailing directions of the Atlantic Coast Pilot. Those directions are intended as a guide to navigators by night as well as by day, and do not mean to lay down any rigid rule, but are to be interpreted as intending to allow a reasonable margin for differing judgments. They are to be read in connection with the charts, which are supposed to inform navigators more particularly in respect to the nature of the channel and its facilities for navigation. According to these charts, a deviation of double the distance actually made could have been made with perfect safety.

The case resolves itself into the question whether the tug went out of the channel usually pursued by navigators. If she departed from the customary course of navigation, undoubtedly she did so at her own risk. The master of a tug is not at liberty to disregard the customary course of navigation upon the waterway over which he is to perform a towage service. It must be assumed that such a course has been adopted upon some foundation of reason and experience showing it to be a safe and expedient one, and, if it is ignored or violated, the presumption is against the prudence of the act. We have searched the record in vain for any testimony that it was contrary to the customary course of navigation for vessels to proceed over that part of the channel where the disaster occurred. No witness in the case has testified that that part of the channel was not customarily traversed by vessels, or that the usual channel of navigation was to the eastward of the course taken by the tug. Of the 20 pilots who were examined as witnesses, not one testified that a distance of 300 feet from the middle of the passage would be outside the usually navigated channel; and, indeed, the question was not asked of any of them whether it would or would not, nor was it asked what part of the passage at that part of Quick's Hole would be regarded as the usual channel of navigation. There was testimony in the cause tending to show that, after leaving buoy No. 2 going to the southward, the usual course was to the eastward of mid-channel. There was a perfectly good reason for this in the existence of the southwesterly shoal, and it was conformable to the sailing directions of the Atlantic Coast Pilot, which required a change of course to eastward after passing buoy No. 2. It is quite probable that the court below was led into a misapprehension upon this question of fact by the course of the trial. When the action was brought, the libelant was unaware that the barge had struck the boulder on the northwesterly shoal, and he brought the suit on the chance of recovering upon the

theory that Quick's Hole was not a safe channel for coal barges drawing 22 feet of water, or upon some other theory that might be developed during the trial. All the testimony for the libelant was introduced for the purpose of showing that fact. The owner of the tug had become informed of the existence of the northwesterly shoal, but was obviously content to litigate the cause upon the libelant's own theory until the last moment, when it would be too late for the libelant to make any change of front. When nearly all the evidence offered for both parties had been introduced, evidence was introduced for the tug showing the existence of the northwesterly shoal, and describing its character. If this evidence had not been introduced, the case would have been a clear one for dismissing the libel; but when it was introduced, in view of the nature of the injuries which the proofs showed had been sustained by the barge, the conclusion was irresistible that the barge had struck one of the boulders of that shoal, and consequently that the barge had been towed upon a course as far from the middle of the passage as the location of the boulder. The course pursued by the defense was not altogether a commendable one, but perhaps was justified by the speculative nature of the libelant's action.

It is a circumstance in support of the theory that the course of the tug and tow was out of the usual channel, that, until the disaster to the barge, no vessel had ever struck the boulder in question; thus suggesting an argument of some force that vessels previously had not been accustomed to proceed as far to the westerly side of the channel. But the proofs show that, notwithstanding the channel was regarded almost unanimously by the pilots who were witnesses as entirely safe for vessels of 22 feet and over, it was very seldom that vessels of that draught or vessels of the draught of 20 feet had occasion to use it. Nearly all the vessels having occasion to use Quick's Hole are vessels of from 14 to 18 feet draught. Of course, such vessels would have passed the boulders safely. Vessels drawing 20 feet of water could have passed between the three boulders with safety, and could have proceeded safely on the westerly side of the shoal, where the water was from 27 to 30 feet deep. It appears, also, that the average rise and fall of the tide in Quick's Hole is four feet, and, except at low tide, a barge having the draught of the Felix could have passed over the shoal in safety. And, going at low tide, vessels of the draught of the Felix, many in number, might have passed very close to the boulder on the eastward without touching it. In view of these facts, it is not strange that no accident ever happened before to a vessel using Quick's Hole at the northwesterly shoal.

We conclude that the proofs do not establish culpability on the part of the tug, and therefore that there should have been a decree dismissing the libel.

The decree is reversed, with costs, and with instructions to the court below to dismiss the libel.