---

## THE NAOS.

(District Court, D. Maine. March 14, 1906.)

### No. 43.

**1. SHIPPING—CHARTER—LIABILITY OF CHARTERER FOR NEGLIGENT TOWAGE.**

A charterer who contracts to "furnish" certain towage to the chartered vessel cannot relieve himself from responsibility for the manner in which the service is performed by employing a tug to perform it but is liable for any damage or injury caused to the vessel through the negligence or fault of such tug.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Shipping, §§ 219, 220.]

**2. SAME—TOWAGE—LIABILITY OF CHARTERER AND TUG FOR GROUNDING OF TOW.**

Respondent Pownal Granite Company maintained a wharf on a small stream in which the tide flowed, and chartered the schooner of which libelant was master to carry a cargo therefrom agreeing to furnish towage in and out of the stream. It employed its co-respondent's tug to perform such service and notified the master when to come to take

the schooner out. The channel was shallow, crooked, and narrow which rendered the towing hazardous with a loaded vessel, and the master of the tug notified the company's manager that he desired to be advised in time when the schooner would be loaded so as to start with her before the tide reached the top, which would enable him to get her off on the rising tide should she touch bottom. He arrived with the tug an hour before high tide, but the manager detained the schooner to finish loading so that she started at full tide, and shortly after leaving the wharf, grounded and received injury. *Held*, that the company was liable for the injury on its contract to furnish towage and because of its detention of the vessel, and that the owner of the tug was also liable for negligence in starting after such detention,' both knowing the risk; that the schooner was not in fault, it being shown that her master was wholly unacquainted with the stream, and assumed no control whatever of the towing.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Shipping, §§ 219, 220; vol. 45, Cent. Dig. Towage, §§ 24-26.]

In Admiralty.

Benjamin Thompson, for libelant.

W. G. Chapman and W. H. Gulliver, for respondents.

HALE, District Judge. This libel in personam was brought by Henry H. Enfield, as master, and for the owners, of the schooner Eva May against Pownal Granite Company, a corporation, to recover damages sustained by the schooner while being towed out of Cousin's river, in this district, by the steam tug Naos. Upon the filing of the libel, the Pownal Granite Company appeared and presented a petition under admiralty rule 59, setting out that the steam tug Naos and her master, Horace T. Perkins, ought to be proceeded against for the reason that:

"If the grounding of said schooner was not wholly or partly caused by the fault and negligence of those in charge of the said schooner, it was wholly or partly caused by the fault and negligence of those in charge of said steam tug."

Thereupon process issued, and was duly served upon the tug and her master. The tug Naos and her master and part owner, Horace T. Perkins, in behalf of the owners, became parties claimant, and duly filed their answers; and the cause has been tried as though they had been made parties upon the original libel. The schooner Eva May is a two-masted coasting schooner, having a centerboard, and being of about 130 net tons, about 105 feet in length, drawing, when loaded, about 9 feet, and having a carrying capacity of 225 to 240 tons. The Pownal Granite Company is a corporation doing a granite business and maintaining a wharf on the westerly side of Cousin's river in the town of Yarmouth. On the 21st day of October, 1901, this corporation requested Chase, Leavitt & Co., ship brokers, of Portland, to charter a vessel to carry a cargo of granite from Cousin's river to New York; and on that day negotiations were entered into with Captain Enfield, master of the Eva May, for the charter of his vessel; he offering his schooner for the voyage, for the lump sum of $350, with the further agreement that the charterer should load and discharge the cargo with the assistance of the vessel's crew, and should tow the vessel to Cousin's river and back to Portland, the schooner to be

free of wharfage. The pleadings in the suit and all the testimony admit that the Pownal Granite Company agreed to tow the libelant's vessel from Portland to Cousin's river and back to Portland. Under that contract the Pownal Granite Company was bound to provide towage and to furnish a steam tug for that purpose. In pursuance of the contract the Pownal Granite Company did hire the steam tug Naos to perform the towage service. This steam tug is a vessel of about eight tons burden, owned by the respondent, Horace T. Perkins, and Alfred T. Dowling, and employed in the general towage business. Chase, Leavitt & Co., the brokers, in pursuance of the terms of the charter, and acting for the Pownal Granite Company, engaged the steam tug to tow the Eva May from the Boston & Maine Railroad wharf in Portland to the respondent's wharf in Cousin's river, and back to Portland, for the sum of $40.

The testimony shows that Capt. Perkins, the master of the Naos, employed Charles A. Brown as a pilot for the steam tug while performing her towage service. On the morning of October 24, 1904, the Naos proceeded to the Eva May, and towed her up the Cousin's river and reached the respondent's wharf about 11 o'clock in the forenoon; the schooner was at once winded by the steam tug. Upon the arrival of the schooner at the respondent's wharf, Mr. Malcolm, the company's superintendent, began the loading of her cargo, and continued loading until about noon Friday, October 28th. Capt. Enfield, master of the schooner, had never been on Cousin's river before, and testifies that he knew nothing of the character of the channel; that he gave no directions as to when or how his schooner should be towed in or out; and that he took no part in the engagement of the towboat, or in determining who should act as pilot, or who should have charge of the navigation of the towboat during the towage service. Soon after the arrival of the schooner at respondent's dock in Cousin's river, Capt. Enfield heard certain rumors questioning the competency of Brown, who had been employed to pilot the vessel in; he called the attention of Mr. Malcolm to the rumors and stated substantially to Mr. Malcolm that the Eva May was in charge of the respondent company. No new pilot was engaged. On Friday morning, October 28, 1904, Mr. Malcolm, the agent, stated to Capt. Enfield that he should have the loading of the schooner completed so as to tow her out on the high water on that day. Capt. Enfield then stated to Mr. Malcolm that he did not think she would be loaded so as to go out on that tide; but later that morning Mr. Malcolm telephoned for the Naos to tow the schooner out during the forenoon. About 12 o'clock the Naos arrived at the respondent's dock in Cousin's river. At the time of the steam tug's arrival, there was some talk between Mr. Malcolm, acting for the granite company, and Capt. Perkins, the master of the Naos, in reference to the time when the schooner ought to start in order to be towed out safely. Mr. Malcolm said that he wanted to put three or four more pieces of granite on board. The testimony shows that the captain of the schooner took no part in the matter of determining when the schooner should start, and gave no directions as to how the tow should be made fast. About high water,

the tug made fast with a line from over each bow of the schooner leading to the tug's after bitt. The captain of the schooner appears to have followed the instructions given him in reference to following the tug, but when the schooner had been in tow about four or five minutes, and had been towed about 300 yards, she took the bottom. On the same afternoon, at low water, it was found that the water on her port side was about a foot deeper for a distance of about 100 feet than it was on the starboard side forward of the main rigging.

1. The charter in this case presents a contract under which the Pownal Granite Company was bound, not only to pay the towage on the libelant's vessel to Cousin's river, and back to Portland, but to furnish such towage. The letters and telegrams which passed between Chase, Leavitt & Co. and the respondent show distinctly what the contract was. The granite company, the charterer, did, in fact, employ the steam tug Naos to perform the towage service. I must conclude, then, that the charterer had assumed by its contract the duty of furnishing towage. The liability of the charterer then became fixed. As between these two parties, the granite company became responsible to the libelant for any injury which his vessel should sustain by the negligence of those in charge of the steam tug while performing the towage service. In Thompson v. Winslow, 128 Fed. 73, this court discussed questions relating to a similar contract and held that:

"The consignee of a cargo, having assumed by his contract the duty of furnishing towage, cannot relieve himself from liability for the manner in which it is performed by the employment of the towing company, and is responsible to the vessel for any damage or injury caused by the negligent manner in which the service is performed by such company."

See, also, Winslow v. Thompson, 134 Fed. 546, 67 C. C. A. 470, in which Thompson v. Winslow was affirmed. The facts in this case do not present an instance where the charterer is relieved from his liability by the employment of a tugboat to perform towage service.

2. Was the granite company, or the tugboat, guilty of fault in the performance of the towage service, or were both guilty of such fault? The granite company owned a wharf on the Cousin's river, and had chartered this schooner to load at this wharf. Capt. Enfield, the master of the schooner, had never been in the river before; he knew nothing about it; he did not hire the steam tug, nor engage the pilot, he had nothing to do with the loading; he had a right to assume that the charterers knew "the hazards attending towage in their own localities, and must also be expected to know the character of the towage service which they employ." Thompson v. Winslow, supra. In Winslow v. Thompson, supra, the United States Circuit Court of Appeals held that the tug was in waters with which she was familiar; that she was under the duty of knowing the place where she was to perform her towage service; that while she was not a common carrier, and was liable only for reasonable diligence, in view of the nature of her service, and in view of her familiarity with the waters where her duty lay, such diligence means very great diligence. In that case, Judge Putnam stated the obligations resting on a tug:

"First. She is 'bound to know,' which means only that she must use proper diligence in ascertaining, the condition of the channels and other waters where she assumes to tow vessels. The Margaret, 94 U. S. 494, 24 L. Ed. 146; The J. P. Donaldson, 167 U. S. 599, 603, 17 Sup. Ct. 951, 42 L. Ed. 202; The Belle, 93 Fed. 833, 35 C. C. A. 623; The Nathan Hale, 99 Fed. 460, 462, 39 C. C. A. 604.

"Second. If the peculiarities involve any special hazard, it is the duty of the tug to make them known to the tow, so far as by due diligence the tug might have ascertained them. The Margaret, 94 U. S. 497, 24 L. Ed. 146.

"Third. If she fails in her duty with reference to propositions 1 and 2, and tows a vessel into a special hazard for that vessel, the tug is liable for the consequences, if injurious, whatever amount of care she may use in the act of towing.

"Fourth. If she enters on a towage involving hazards, as to which she performs her duty under propositions 1 and 2, and damage results to the tow which could not have been prevented by reasonable diligence on the part of the tug in the act of towing, the tug is not liable therefor. The Syracuse, 12 Wall. 167, 20 L. Ed. 382; The Hercules, 73 Fed. 255, 19 C. C. A. 496; The Columbia, 109 Fed. 660, 48 C. C. A. 596.

"Fifth. If, notwithstanding the tug has performed her duties under propositions 1 and 2, she enters a hazardous channel with her tow, and there is guilty of negligence in the immediate act of towage which she might have avoided notwithstanding the hazards, and injury results to the tow in consequence of such negligence during the act of towage, the tug is liable therefor.

"With reference to all the above propositions, we repeat what we have already said, that reasonable care on the part of the tug means a very great degree of care."

It is clear that in the case at bar, the tug was first, "bound to know" the condition of the channels and other waters where she assumes to. tow vessels; second, she was "bound" to make known to the tow any special hazard to which she would be subject. In the first proposition, the expression "bound to know" clearly means that the tug is at law bound to know, and must be presumed to know, the condition of the waters where she assumes to tow vessels. What, then, are the perils of the place?

In his answer to the libel, Capt. Perkins, the master of the tug, says:

"The channel from said wharf out through the Cousin's river was very shoal, narrow, and crooked, and, as a precaution against any grounding of said vessel, it was this respondent's intention to tow the schooner out of said Cousin's river before high tide, so that, in case the said schooner touched the bottom at any place, it would be possible to get her off on the rising tide."

The pilot testifies that at the point where the schooner took the bottom, the river was about 80 feet wide from bank to bank, and the channel where the deep water flows is about 15 or 18 feet, and that the schooner is about 30 feet beam; that the channel was not more than 30 feet wide in the deepest part. He says he does not think that the width of the channel was more than 15 to 18 feet at the place where the vessel grounded. He was asked:

"Do you wish to be understood as saying, Captain, that there was only 15 feet width of channel there at the place where this vessel went aground, where she would float at high water?"

And his answer was:

"I don't think there was any more than that, in the channel; the channel part is where it doesn't go dry; I was telling you where it doesn't drain out

at all at low run of tide. Q. On an average tide? A. It might be wider. Q. How much wider? A. It might be 6 or 7 feet."

He says that the river (evidently meaning the channel) down where he was expected to tow the schooner and make her steer would not exceed 22 feet in the widest place, as near as he could tell, and that she ought to have three feet under her keel to make her steer properly, and that both sides of her bilge must have been very close to the mud. In such a place a very high degree of care was required in the towage service.

In fixing the liability, if any, of either or both respondents in the case, it is necessary to see the exact condition of affairs on the morning when the towage service was begun. The ninth article of the answer of Capt. Perkins says:

"That said steam tug Naos arrived at the landing place of the Pownal Granite Company in said Cousin's river a full hour before the high tide on said day, and was then and there ready and anxious to tow said schooner to said Portland, and then and there notified the master of said schooner, and the said Pownal Granite Company, that he was ready to start, and asked that the hawser of said schooner be passed to said tug; that the said vessel was not then and there ready to start, owing to the fact that she had not received her cargo; and, by reason of the delay in putting aboard the said cargo, this respondent was then and there delayed for a long period of time, to wit, for the space of one hour, during all of which time the dangers of towing said schooner in safety were increased, and this respondent then and there notified said schooner and the said Pownal Granite Company that it was not proper to start the schooner at such a late hour."

The tenth article of Capt. Perkins's answer alleges:

"That the channel from said wharf out through the Cousin's river was very shoal, narrow, and crooked, and as a precaution against any grounding of said schooner it was this respondent's intention to tow the schooner out of said Cousin's river before high tide, so that, in case the said schooner touched the bottom at any place, it would be possible to get her off on the rising tide."

In the eleventh article he further alleges:

"That the tide was just high, and an hour after the arrival of said tow-boat * * * she started to tow said schooner, and had only proceeded 200 or 300 yards, when the said vessel, either owing to the unskillful and careless manner in which she was steered, or because of the shallow water, then and there took a sheer, and ran into the southerly bank of said river."

The whole testimony produces the conviction that the proper time to start the towage of a vessel at the place where the towage service was performed was before high water, so that, if the vessel should touch in any of the dangerous places in the channel, she could be got off on the rising tide; that the danger of grounding was a peril always to be considered. Capt. Perkins says that he warned Mr. Malcolm to let him know when the vessel was loaded, so that he could get there and start her before high water; and that, on the day when the schooner was to be towed out he reached the respondent's wharf at about one hour before high water, so that he would have the rising tide to help get the schooner off in case she got on to the bank; and that, when he reached the vessel, he asked Mr. Malcolm, the agent of the granite company, if the schooner was ready, and Mr. Malcolm

replied, "It is not high water yet, is it?" and Capt. Perkins replied, "No, but we ought to be going, now is the time to start." And then Mr. Malcolm said that he had "three or four more stones to put on first," and that he then told Mr. Malcolm that he would not guaranty to take the schooner down without grounding, unless he started before high water. Mr. Malcolm disputes Capt. Perkins' account of the conversation, and says that he does not recollect any objection on the part of Capt. Perkins to starting the vessel at the time he did start, nor any talk to the effect that he would not guaranty to take her out. Whatever the conversation was, it is clear that the granite company did not have the vessel loaded promptly and in season to start for a sufficient time before the "top of the tide" for the purposes of safety.

The agent of the granite company must be presumed to be familiar with the river where he was doing a granite business; he must have known that towing in the channel of the river was very hazardous, and that vessels often grounded in the channel; that the pilot, who was to perform the pilotage service for the tug, had lately got aground in the channel with a vessel which he was towing; that the danger of grounding was one of the great hazards always presented to vessels being towed in that channel. With all these facts before him, the agent of the granite company held the vessel at her loading berth while he completed her loading, and finally allowed the schooner to start, only when her captain objected to taking on more stones, and stated that the vessel was loaded. He thus held the schooner, and delayed the towage service for a considerable time, and did not start until about the "top of the tide," so that when the grounding occurred there was no flowing tide upon which to get her off. And the testimony tends to show that if the tide had been flowing, the schooner could have been hauled off at once. The evidence tends also to show that, although Mr. Malcolm had hired a towboat to perform the towage service, he himself undertook still to control the essential details of that service; he selected the day when the schooner should be towed out, and insisted upon it, although Capt. Enfield had suggested to him that the schooner would not be loaded in time to go out on that tide. He had the fact repeatedly enforced upon him that the schooner ought to start before high water; and still he delayed her for a considerable time before starting, although Capt. Perkins had asked to be advised of the time of towing out, so that he could get there an hour before high water. Capt. Perkins did arrive with the tug about an hour before high water, and was prevented from starting the towage service by Mr. Malcolm's delay in loading. In Thompson v. Winslow, supra, the charterer did not attempt to dictate the time, place or manner of performing the towage service in reference to the Marjory Brown. In that case, the towboat company was hired to render the towage service; and the whole responsibility was placed upon that company to arrange the details of the service. In the case at bar, the charterer hired the towboat to do the towage service, but still retained and assumed control in all matters relating to the loading of the schooner, the time of starting, and other essential details with

reference to the beginning of the towage service. Although the charterer had made a contract with the towboat, which technically was an "independent" contract in the sense that it was a contract with which the schooner had nothing to do, the testimony convinces me that the charterer did not leave the towboat in an independent position under its contract at any time up to the starting the towage service. The test which the law applies in passing upon the liability of a charterer, who makes a contract with another to perform a specified undertaking, is whether or not the charterer reserves to himself or assumes any control over the means or instrumentalities to be employed by the contractor. The law relating to this subject is fully discussed by Judge Wallace, speaking for the United States Court of Appeals for the Second Circuit, in Smith v. Bouker, 49 Fed. 954, 1 C. C. A. 481. See, also, Corrigan v. Elsinger (Minn.) 83 N. W. 492. In the case at bar, the evidence constrains me to believe that the granite company did reserve to itself and exercise a control over the means and instrumentalities which were to be employed by the tugboat. The granite company was, therefore, in my opinion, guilty of a fault, which contributed to the injury.

The fault of the charterer, however, does not justify or excuse the towboat from liability. After being detained by the agent of the granite company until about the "top of the tide," so that the danger of grounding became too imminent a risk to run, the duty of the master of the towboat was to insist upon waiting another day. Capt. Perkins, as well as Mr. Malcolm, could see that the tide was an unusually low tide; that the chances were that upon another day there would be a higher tide; and, in fact, there was a higher tide on the following day. In any event, the master of the towboat was not justified in entering upon the service at an improper time, even though he was urged to do so by Mr. Malcolm. The liability to ground in the channel was an imminent hazard. The imminence of the hazard was not communicated to Capt. Enfield either by the tugboat or the granite company. It was negligence on the part of the captain of the towboat to start out at a time when any such grounding was likely to interrupt the towage service and cause damage, even though he was urged to this delay by the charterer. He was guilty under the third proposition of fault, as laid down by Judge Putnam, in Winslow v. Thompson, supra. Both the granite company and the towboat must be held guilty, each of a fault in this regard. Having thus affirmatively held both the charterer and the towboat in fault, it is not necessary for me to discuss the other charges of fault which are urged against them.

3. Was the libelant also guilty of a fault? In the case of the Marjory Brown, in Thompson v. Winslow, supra, this court said in referring to the alleged negligence of Capt. Thompson:

"It is clear from the testimony that he was not informed of the situation; he had never been in Back Bay before; he knew nothing of the location of the place where the towage was to be performed; he did not direct that the vessel should be towed, or do anything further than follow the orders of the captains rendering the towage service. * * * He was not informed of the depth of the water, the nature of the bottom, or the location of the channel."

In that case the court quoted from the language of Judge Choate, in White v. Steam Tug Lavergne (D. C.) 2 Fed. 788:

"The master of a towed boat is not chargeable with contributory negligence in acquiescing in the exposure of such boat to an unnecessary peril by the tugboat pilot unless the danger about to be incurred is very obvious."

In the case at bar, while the dangers of the channel must be assumed to be known to the tugboat, and while they were obvious to the agent of the charterer, who for a long time had done his daily business upon that river, they were not obvious to Capt. Enfield. He had been lying several days at the granite company's wharf; but the information gathered from observations during those days cannot be held to have charged him with knowledge of the shape of the river bed, with the depth of the water at particular places in a channel having all the peculiarities that the testimony shows this channel to have had. Capt. Enfield had a right to rely upon the assurance that his vessel should be towed out properly; he had a right to assume that both the charterer, who by his contract had agreed to perform the service, and the steam tug that was rendering it at the charterer's charge and solicitation, were fully cognizant of all the perils attending the towage service. Capt. Enfield testified that he had never been down the river at low water, that he did not know how much the tide would rise that day, that he took no part in determining when the vessel should start, that he gave no directions as to how the line should be made fast, and that he knew nothing about the river. There was nothing in the situation to advise him at the time of starting that the tide was a low run of tide, and that it would have been safer to have waited until the following day. I must conclude that the libelant was not guilty of fault.

4. The court holds, therefore, that the libelant is entitled to a decree against the Pownal Granite Company for a moiety of the damages suffered by the said libelant, and for a moiety of the costs. The libelant is also entitled to a decree against the claimant of the tug Naos and her owners, for a moiety of the damages and for a moiety of the costs; and if either of said parties respondent shall be unable to pay such moiety, both of the damages and of the costs, then the libelant shall have a remedy over against the other party, for any balance thereof which may remain unpaid.

An interlocutory decree of liability may be entered, consistent with this opinion. Fritz H. Jordan, Esq., may be appointed assessor.

Upon the coming in of the report of the assessor, I will direct the settlement of the final decree.