### BLANCHARD LUMBER CO. v. METCALF.*

(Circuit Court of Appeals, First Circuit. February 3, 1925. Rehearing Denied March 20, 1925.)

No. 1779.

**1. Shipping ⬡54—Charterer held liable for negligence of towing tug under terms of charter party.**

Under a charter of a schooner by which the charterer agreed to tow the vessel to and from the river ports where she was to load, it was liable for any negligence of the tug employed.

**2. Towage ⬡11(1)—Tug master held not negligent in taking what was considered by navigators the preferable and safer of two channels.**

The master of a towing tug *held* not negligent in taking the port instead of the starboard channel past a shoal in the river, on his testimony and that of his father, both experienced navigators in the locality, that for 20 years the port channel had been considered preferable and safer.

*Certiorari denied 45 S. Ct. 513, 69 L. Ed. ——.

**3. Towage ⬡12(2)—Master of schooner and of towing tug both held in fault for stranding of schooner.**

The master of a schooner and the master of a towing tug both held in fault for the stranding of the schooner in a tidal river; the master of the schooner for ordering her out after the most favorable state of the tide had passed, and the master of the tug, who knew the river, for obeying the order.

Appeal from the District Court of the United States for the District of Massachusetts; James Arnold Lowell, Judge.

Suit in admiralty by Jesse H. Metcalf against the Blanchard Lumber Company. Decree for libelant, and respondent appeals. Decree vacated, with direction to modify.

Robert Goodwin, of Boston, Mass. (Robert R. Duncan and Goodwin, Procter, Field & Hoar, all of Boston, Mass., on the brief), for appellant.

Foye M. Murphy, of Boston, Mass. (Blodgett, Jones, Burnham & Bingham, of Boston, Mass., on the brief), for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. This is an appeal from a decree awarding $8,900 for damage done to the schooner Susan B. by stranding her on a shoal, known as the Middle Ground, in the River Hebert in Nova Scotia. The decision below is based solely on the court's finding that the captain of the tug furnished by libelee was negligent in taking the schooner out by the port channel when due care required him to go the other side of the shoal.

The Susan B. was a three-masted schooner, 148 feet long, 455 gross tons. She was chartered by the appellant on June 12, 1922, to transport a cargo of laths from the River Hebert, in the Bay of Fundy, to New York. She went from Bangor to Parrsboro, and there reported to J. W. Kirkpatrick, who was the appellant's agent in the matter of loading the cargo. The charter party contained material provisions as follows:

"Charterers agree to tow vessel at their own expense, light, from Parrsboro to River Hebert, and, when loaded, from River Hebert to Parrsboro, or where vessel can get under way. Charterers guarantee sufficient water under this charter party for vessel drawing 16 feet fully loaded. * * *

"Vessel to move to such loading and discharging berths as charterers may direct, where she can always lie safely; they have the privilege of moving her thereafter by paying towage."

The owner agreed that the vessel was in order and fitted for such a voyage, which, of course, included a proper crew and a competent and careful captain. The charter further provided that the vessel should be loaded at the rate of 200,000 laths per regular work day, Sundays and legal holidays excepted, and unloaded at the rate of 175,-000 laths per day, and that for delay due to the charterer's fault demurrage should accrue at the rate of $60 per day. The charterer was to pay the owner $1.75 per 1,000 laths for the use of the vessel. The owner would consequently desire a full cargo. The time of the use of the vessel would be measured by the time taken in the voyage, plus the time required for loading and unloading at the stated rate. Time taken, not due to the charterer's fault, would ground no claim to demurrage, but would hurt the employer of the schooner's captain. The conduct of the two captains must be considered in the light of this financial situation.

[1] The appellant's first contention is that "the charterer, having used due diligence in selecting a proper tug in charge of a competent master, is not liable for negligence on the part of the tug."

On this point we agree with the court below that the charterer was liable for any negligence by the tug. Under this charter party the undertaking of the charterer was to furnish towage, not merely to hire a tug. This conclusion is, we think, supported by the overwhelming weight of the authorities. See Thompson v. Winslow (D. C.) 128 F. 73; The Naos (D. C.) 144 F. 292; Pennsylvania.R. R. Co. v. Golden (D. C.) 243 F. 256.

We see no occasion to discuss any dicta indicating a different doctrine under different conditions.

[2] Appellant's next contention is that the court erred in finding that the tug was negligent in undertaking to steer to the left instead of to the right of the Middle Ground. On careful examination of the record, we are unable to adopt the view of the court below, on that point. The captain of the tug, Walter H. Wasson, testified that he had been master of a towboat about 6 years, and had been navigating the Bay of Fundy and its estuaries for 10 years; was familiar with the Middle Ground and the channel; that before towing the Susan B. he examined the channel in company with Capt. Covert of the schooner, and then concluded that the proper way to take the schooner out was on the usual route—of following the port chan-

3 F.(2d)—49

nel. Capt. Wasson's father, whose home was in Parrsboro, a master mariner of 35 years' experience, 30 years around the River Hebert, testified that the Middle Ground was a shoal well known to everybody that navigated the river, and that the main channel for 20 years had been on the port side, and was there in 1922. Moreover, it appears, both from the chart and a sketch made at the trial, that, apart from the question of which channel was deeper, there was an "S" turn of the river, first to the left and then to the right, so that, as the evidence showed, it would be difficult and apparently dangerous to steer such a vessel as the Susan B. through the starboard channel. After the schooner was stranded, Covert, who remained on board, testified that at low tide there was a little brook in the starboard channel, and that in his opinion the schooner "would successfully have negotiated the turn if they had taken the starboard channel." We find practically nothing else in the record to control the evidence of the two Wassons, long familiar with the locus, that navigators in general had for 20 years regarded the port channel as the proper channel. There is plainly no reason why Capt. Wasson should not have selected the channel he thought the safer of the two; his good faith is not questioned. He and his father certainly knew more about navigating that river than Covert did. We are constrained to the view that the evidence of the two Wassons, grounded on their own experience and upon the general knowledge that they had of the experience of other navigators, must control any inference to be drawn from Covert's testimony that there was a little water in the right or starboard channel when the left channel was entirely dry, and his opinion, after the event, as to the cause of the accident.

We conclude that the finding of the District Court, that the tug was negligent in taking the Susan B. by the port channel, cannot be sustained.

[3] But it does not follow that there is no liability by the charterer to the schooner. The inescapable fact remains that the schooner was, in good weather, in a tidewater river having at times abundant water for such vessels, grounded and damaged. A careful examination of the record warrants the conclusion that both captains were negligent, and that the damages should therefore be divided. A statement of all the evidence and reasons leading to this result would unduly prolong this opinion; we content ourselves with what we think is a sufficient outline:

It is clear that the essence of the problem was so to time the towing as to take proper advantage of the high tides. The charterer's guaranty of 16 feet of water must, of course, be construed in the light of the conditions which both tug and tow knew they must face in a tide river or estuary running into the Bay of Fundy, where the tides run 45 feet. Plainly, it was the duty of both captains to confer and to collaborate, in order to achieve, jointly, a safe and efficient result. This at the outset they undertook to do by visiting the River Hebert by automobile in company with Kirkpatrick, who had charge for the charterer of furnishing the cargo. This inspection tour gave the schooner captain much of the knowledge of local and tidal conditions possessed by the tug captain. It was suggested that the schooner might be loaded from lighters at Carter's Beach, farther down the river below this shoal, where there was no wharf. Vessels had frequently loaded there. To this Covert objected, preferring the wharf at the village above, where there was at high tide sufficient water, about 19 feet. Plainly, in this decision, the schooner captain took some responsibility; for he was at that time, both by information and by observation, pretty fully advised of the risks and difficulties of navigation in that river. Accordingly the schooner was berthed by the tug at the River Hebert wharf on July 4; so that Covert then for several days saw the ebb and flow of the tide in that river. Again, he was warned by Capt. Wasson that the schooner should be ready to sail by Saturday, July 8, after which the tides would begin to neap. But she was not ready. Capt. Wasson was telephoned at Parrsboro not to come until Sunday, July 9; although he had understood when he left that the schooner was to leave that wharf on July 8. Here, again, the schooner captain took responsibility. On Monday, July 10, the tug towed up the river a scow carrying the deck load for the schooner; at that time there was again discussion between the two captains as to whether the schooner should be moved down the river beyond the Middle Ground, there to receive the final installment of cargo, which would increase her draft about 4 inches. Her draft loaded was 14 feet 10 inches. Again Captain Covert took responsibility in insisting that he would stay where he was until the schooner was fully loaded. If he had followed the tug captain's advice, he would have gone out on the high tide of July 10, which was about 10 inches higher than on the succeeding day, and with the

schooner drawing 4 inches less. During the afternoon of Monday, July 10, there was much wrangling between the two captains as to responsibility for getting the schooner out, and again on Tuesday morning there was further sharp controversy as to getting off a little before instead of a little after the flood tide. In that region there is but a moment of slack water. Wasson told Covert that he ought to be ready to start as soon as the schooner floated, so as to be down to the Middle Ground, about a mile below, at flood tide. But the vessel was delayed. The mate had disappeared; the schooner finally sailed without him. For this failure in discipline the tug was not responsible. There was delay in pulling up the anchors, so that the start was about 2 o'clock. On the weight of the evidence, the schooner did not start from the wharf for a full half hour after she should have started. Except for this delay, for which the schooner and not the tug was responsible, it is probable that the grounding would not have occurred, as the tide had then fallen, perhaps 3 feet. There is evidence that she did not steer well, failing to follow, as she should, exactly in the wake of the tug.

At any rate, when she reached the Middle Ground about half an hour after starting, there was not water enough to go over the shoal. She grounded. At the next high tide, about 1 o'clock in the morning, a futile attempt was made to haul her off. In the view we take, it is immaterial whether the damage mainly resulted from the so-called second or from the first grounding. For present purposes, the two groundings were essentially one. The schooner had to stay until the next course of high tides, some 11 days, with resultant damage, as the parties agreed, of $8,900.

Without further detailed review of the evidence, we reach the conclusion, as noted above, that both captains were wrong. Each was trying to lay off on the other the responsibility. The schooner captain placed, as his own evidence indicates, an undue and improper reliance on the provision in the charter party for 16 feet of water; and, so relying, he insisted that the vessel should start after the time for safe starting had elapsed, as he should have known. The District Court said: "I find on the evidence that Capt. Covert, relying on the guaranty of 16 feet, his schooner being loaded 14 feet 10 inches ordered the vessel out, and that Capt. Wasson 'took a chance' as he expressed it." This finding goes far to support our conclusion that both captains were wrong. When Capt.

Covert "ordered the vessel out," he knew nearly as much of the risks as did Capt. Wasson; yet he took the responsibility of giving a peremptory order to the tug captain, actuated, apparently, by fear of two weeks' waiting for the next course of high tides. We think his order was wrong, and also think that Capt. Wasson should have refused to obey it.

The decree below was for $8,900, with interest from May 12, 1924, and costs to the libelant. Libelant is entitled to costs in the court below; the appellant is entitled to costs in this court. The result is that decree must be entered for the libelant for $4,450 damage, plus $268.19 costs, with interest on the aggregate of $4,718.19, from May 12, 1924, to date of decree under mandate from this court, less taxable costs in this court.

The decree of the District Court is vacated, and the case is remanded to that court, with directions to enter a decree for the libelant for $4,450 plus $268.19 costs, with interest on the aggregate of $4,718.19 from May 12, 1924; the appellant recovers its costs of appeal.