**THE SATURN.**
**THE PERSEVERANCE.**
**THE K. WHITTELSEY.**
**THE HUSTLER.**
**THE GEORGE W. PRATT.**
**THE CLEARY NO. 68.**
**THE O. T. NO. 15.**
**C. F. HARMS CO., Inc., v. CORNELL STEAMBOAT CO. et al.**
**CLEARY BROS., Inc., v. SAME.**
**OIL TRANSFER CORPORATION v. CORNELL STEAMBOAT CO.**

Nos. 12801, 12806, 12968.

District Court, E. D. New York.
July 11, 1932.

Foley & Martin, of New York City (J. A. Martin, of New York City, of counsel), for libelants C. F. Harms Co., Inc., and Cleary Bros., Inc.

Kirlin, Campbell, Hiekox, Keating & McGrann, of New York City (Robert S. Erskine and Henry P. Elliott, both of New York City, of counsel), for Cornell Steamboat Co. and tugs Perseverance and George W. Pratt.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and A. Howard Neely, both of New York City, of counsel), for Oil Transfer Corporation and tugs Whittelsey and Hustler.

BYERS, District Judge.

These three causes were tried together, and involve a collision between two tows, the one south-bound, and the other north-bound, in the Hudson river near New Baltimore, some 20 miles or so south of Albany, on October 23, 1931.

A. In the first cause, the libelant, as owner of the deck scow Saturn, seeks to recover for damage sustained by the latter, in the south-bound tow, against the steamtug Perseverance having the said scow in tow, and the Cornell Steamboat Company as owner; and against the tug K. Whittelsey, the tug in charge of the north-bound tow, and Oil Transfer Corporation, the owner of said tug.

The Perseverance was claimed by the Cornell Steamboat Company, which filed answer alleging freedom from fault, and attributing fault to the north-bound tow, in that the tugs Whittelsey and Hustler propelling the north-bound tow were to blame. A petition under the rule was filed, impleading the tug Hustler.

The Oil Transfer Corporation claimed the K. Whittelsey, and answered as owner; also as respondent to the libel. It also claimed the tug Hustler, and filed answers to the libel and to the petition. Likewise it filed a petition impleading the helper tug George W. Pratt of the south-bound tow. The latter was claimed by the Cornell Steamboat Company, which filed answers to the libel and to the petition.

B. In the second cause, Cleary Bros., Inc., as owner of the scow Cleary No. 68, also in the south-bound tow, filed a libel similar to that in the first cause.

Thereafter, by the same succession of pleadings, the same vessels and parties were

brought before the court, in all respects as in the first cause.

C. In the third cause, the Oil Transfer Corporation, as owner of the barge O. T. No. 15, in the north-bound tow, filed its libel against the tugs Perseverance and George W. Pratt, of the south-bound tow; these were claimed by the Cornell Steamboat Company, which filed an answer to the libel, alleging that blame for the collision rested solely upon the north-bound tow.

The Hudson runs slightly west of south, between New Baltimore and Matthews Point, on the west shore, and, in this section, Hotaling Island constitutes the east shore of the main portion of the river. At the time in question, a 300 foot channel of a depth of 27 feet, lying near the center, was in the course of excavation, to afford the passage of deep draft vessels as far north as Albany. That channel is indicated upon U. S. Govt. Chart No. 284, which is an exhibit in the case.

From shore to shore, the river is about 900 feet wide between the two places mentioned, and the new channel lies a little nearer to the east than to the west shore.

For ostensible convenience, the attention of the court and counsel has been somewhat directed to a rectangle on the river's surface, 1,700 feet long and 300 feet wide, constituting this deep channel, the northerly side of which is an imaginary line running east and west through a green buoy placed 180 feet from the east and 120 feet from the west line of the deep channel; and the southerly line of which runs across the upper end of a scow heading up river, the starboard side of which was about 140 feet from the east line of the deep channel. That scow was alongside to starboard a dredge named the Boston, off Matthews Point, the lower end of which extended down river from the scow. Between the dredge and the buoy, and somewhat nearer the latter, and also nearer the west edge of the deep channel, lay a drill boat called the Rack-A-Rock. The latter and the dredge were engaged in the excavation of the deep channel.

This rectangle is of value, to the extent that it fixes attention upon the aspect of the surface of the river, on the morning in question, but is misleading if it suggests that the navigation of these tows was required to be conducted as though the easterly edge of the deep channel established the starboard area of maneuver of the north-bound tow.

On the east side of the river, about opposite Matthews Point, is a red buoy, shown on the said government chart, between the east edge of the deep channel and the shore on that side.

It is necessary to have clearly in mind that there is a depth of not less than 16 feet of water between the east edge of the deep channel and the east shore, between Matthews Point and the green buoy, for a width of at least 100 feet, because of the references in the testimony throughout the trial, and in the briefs, to the "bottle neck" (i. e., the 180 feet between the green buoy and the east edge of the deep channel at that place), the "cut," and the like. The river at this point is not a mere 300 foot stream to be visualized as flowing between fixed limits, and affording no sufficient depth for a vessel drawing 13 feet, east of the east edge of the deep channel.

The latter did not restrict the movements of the ordinary tows which have plied upon the river for many years, except to render it necessary for them to avoid contact with the floating tools of excavation.

From the east side of the scow alongside the Boston, there was at least 260 feet in which the north-bound tow could proceed, and that width of water did not diminish south of the green buoy.

The Perseverance tow, being south-bound, was constituted as follows:

It consisted of twelve laden canal boats, in four tiers of three, close coupled, on two 100 foot hawsers to the tow-boat. "Spiked" on the port side, at the third tier, was the scow Saturn, light; and to the fourth tier on the same side, the scow Cleary No. 68, also light. Thus the tow was made up at Albany. Because of fog, it was necessary to hang up south of Castleton, on the east shore, from 4:10 a. m. to 7:20 a. m. on the day in question. Progress down-river was resumed at the latter hour, and about 3 miles below on the west shore, a loaded stone scow was picked up by the helper tug Pratt, and made fast astern of the port canal boat in the last tier. This scow was wider than the canal boat, and hence projected to port, partly astern of the second light scow spiked to the fourth tier. Proceeding south, the tow followed the course of the river which inclines to the east, and approached New Baltimore. At the latter, the inclination is to the west, and there the course straightens away slightly east of south.

The length of the tow, from the bow of the Perseverance to the stern of the stone scow, was approximately 800 feet. The beam of the Perseverance is 31 feet.

The width of the tow at the first two tiers was about 70 feet (the canal boats being about 110 feet long and about 22½ feet wide), and at the third and fourth tiers, this was increased by 32½ feet, the beam of the light scows, making the greatest width of the tow about 103 feet. The helper tug Pratt, having a beam of 17½ feet, was alongside the second tier to starboard, not made fast, and was in that position to hold off the tow, on that side, from the drill boat and the dredge, when the tow should arrive in their vicinity. The Pratt did not add to the width of the tow, for the purpose of calculating the passing of the north-bound tow, as will be seen presently.

The speed of the Perseverance tow was better than 3 miles per hour, just prior to the collision, and while the tide had ceased to ebb, low water having occurred near the green buoy at approximately 8:35 a. m., there was a barely perceptible down current in the river, until after the collision which happened at 9:05 a. m.

It is not found that the Perseverance had the tide under foot, in the sense that she had any superior right, or that the north-bound tow was burdened, by reason of the tide. So far as the tide was a factor, it is deemed to have been shown by the testimony that conditions of slack water must determine the respective duties of these tows.

Just above New Baltimore, the course of the Perseverance was a little to the west of south, and it is to be assumed that her tow swung a little to starboard as it came around and then the heading inclined to the east.

At about 2,000 feet above the green buoy above referred to, the north-bound, or Whittelsey, tow was sighted, and the Perseverance blew two blasts, to suggest a starboard passing. No answer being received, the signal was repeated in about two minutes, or after about 500 feet had been covered. These signals were not observed on the Whittelsey, but are deemed to have been shown by the testimony. Upon this basis, it follows that the Perseverance was nearer to the east than to the west side of the river at this time, and expected the Whittelsey to accept the starboard passing suggestion.

At this time the latter tow was about at Matthews Point, about abreast or a little north of the Boston, and blew one whistle for a port passing, and the Perseverance at once answered with one blast. The Perseverance was then about 500 feet north of the green buoy as her pilot says, and mani-

festly the change in his original intention as to the passing required that he shape his course close to the buoy, so as to afford room on his port hand, to the Whittelsey and her tow. While he disclaims any such change, it is thought that one was required, by reason of the change in the method of passing so revealed by the testimony for the Perseverance.

To appreciate the requirements presented to the navigator of the Perseverance at this juncture, it is necessary to understand the constituency of the Whittelsey tow. That consisted of three oil barges in tandem, in tow of the Whittelsey, which had alongside to starboard the helper tug Hustler. The hawser was a bridle, attached to the Whittelsey, 150 feet long.

The Whittelsey is 95½ feet long by 22 feet; the Hustler is 76 by 20 feet. The barges were 175 feet long by 36 feet wide as to the first two, and 146 feet long by 34 feet wide as to the third.

The greatest width of the north-bound tow was 43 feet, and the distance from the stem of the Whittelsey to the stern of the third barge was about 745 feet.

The draft of the barges in this tow was "around ten feet." The draft of the Whittelsey is 13 feet, and of the Hustler 8 feet.

Viewing the Whittelsey tow from the Perseverance, at a point about 500 feet above the green buoy, the latter appeared to be at or near the Boston at the exchange of 1-whistle signals; the Whittelsey tow is found to have been about 120 feet east of the Boston at that time, or nearly in the center of the available portion of the river at that place.

The navigator of the Perseverance had to decide whether he could bring his tow down past the green buoy, and soon enough to permit the Whittelsey tow to pass on the port hand, having in mind that his own course inclined to the west, and that his 800 feet or so of tow would have to pass clear of a north-bound tow having a beam of 43 feet. If the tows were each tailing exactly straight, they could pass in a space of 160 feet, and have a clearance of 20 feet, if the passing were to be wholly within the deep channel.

There was actually 280 feet of lateral area available. Therefore, unless the Perseverance tow would be diagonally across say 230 feet of that space, the passing could be made unless the Whittelsey tow was sheering as she came up the river. No one claims that she was.

■ The extent to which the Perseverance tow was actually sheering toward the east, when the tugs passed each other, cannot be stated, but what happened was this:

The tugs passed each other, and then a collision between the tows was seen to be probable. The Whittelsey blew an alarm and turned partially to starboard, and of course her tow swung a little to port, and then the Whittelsey stopped her engines; the port corner of her first oil barge came in contact with the port bow of the Saturn, the first light scow spiked on the port side of the Perseverance tow, about 6 feet inboard. The Perseverance had been proceeding under one bell, slow, for a brief interval, and stopped her engines just before the collision.

The Whittelsey did not strike any boat in the Perseverance tow, but the stone barge was cast loose by the impact of the second spiked scow, which was forced astern by the Saturn, and the stone scow drifted down alongside the Whittelsey. It will be seen that the place of impact was about 320 feet astern of the Perseverance, and 150 feet astern of the Whittelsey. As the latter did not strike any portion of the south-bound tow, the latter could not have been, as to its fourth tier, or the stone scow astern, in the course of the Whittelsey. Thus the sheer of the south-bound tow is shown not to have been so considerable as to point to fault on the part of the Perseverance in continuing on her course after exchanging the 1-blast signals.

■ It is argued that the Perseverance should have held above the so-called bottle neck, meaning the 180 feet between the green buoy and the east edge of the deep channel, or have turned completely around, and proceeded upriver, to enable the Whittelsey tow to have exclusive occupancy of the so-called cut, because the latter had entered the rectangle above referred to, to the knowledge of the navigator of the Perseverance, at the exchange of signals.

It is thought that this is untenable. There was no cut. There was a width of river available to the Whittelsey, from the Boston, north to the green buoy, of 260 feet, which was ample to accommodate these two tows, and, if the Whittelsey had navigated her tow with that fact in mind, there is no reason appearing in the evidence, why the passing should not have been made in safety.

■ That the Whittelsey did not so navigate, is shown by the following:

The testimony is general on both sides, that the Perseverance passed to port of the green buoy, in the vicinity of which the collision occurred, at not less than 25 nor more than 50 feet. Adopting the latter figure, it will be seen that there was 130 feet on her port hand, to the east edge of the deep channel, and 100 feet more of navigable depth for the passage of the north-bound tow.

The testimony for the latter is that she held to within 100 feet of the shore, on her own starboard hand. If that were true, the collision could not have occurred; therefore it is untrue.

It was offered in order to make it appear that the Whittelsey kept well over to her own side of the river, which is an ex post facto recognition of what should have been done. It is largely defeated by the contention that the red buoys on the east side of the river were kept in line, and that they mark the limit of available depth of water, i. e., that the government chart was closely followed. But that chart indicates that both buoys are east of the deep channel.

■ Moreover, the rule in this circuit was stated in Lehigh Valley Transportation Co. v. Knickerbocker Steam Towage Co., 212 F. 708, 710, as follows: "She [the tug] is bound to know, not only what appears upon government charts, but whatever is known to persons in the habit of navigating the waters in question. But for striking a rock uncharted and unknown to local navigators, the tug is not responsible. The Nathan Hale, 99 F. 460, 39 C. C. A. 604."

The above case involved a claim of liability by a vessel being towed, against her tug, as did the case cited, but no reason is suggested why the same rule should not apply in a collision case. In other words, the Whittelsey's navigator is chargeable with knowledge that he had sufficient depth on his starboard hand to navigate for 100 feet east of the east edge of the deep channel, opposite the green buoy. Instead of proceeding upriver, from the vicinity of the Boston, within the 100-foot margin available to him east of the east edge of the deep channel, he brought his tow up to the buoy, so close thereto that there was a collision with the Perseverance tow, as above described.

The testimony of the captain of the Whittelsey is fortified by a sketch (Cornell Ex. 4) which he drew, making clear the shape of the tows, and showing the Perseverance passing the green buoy "something like fifty feet" to starboard. This sketch shows the Perseverance tow inclining somewhat to port, but not strung across the course of the Whit-

650

telsey. It is incompatible with testimony that the Whittelsey was within 100 feet and the Hustler within 80 feet of the east shore or dike, at or just before the collision.

It must be deemed established by the testimony therefore that the Whittelsey tow did not maintain a course sufficiently close to the east shore of the river after sounding the 1-whistle signal, to avoid the collision.

Fault is also attributed to the Perseverance tow in that its make-up was improper. The opinion evidence on this subject leaves the impression that the mere spiking of the light scows in the manner described was not a fault under the circumstances. Their high sides were not affected by a west wind, for there was none. Their light draft of a foot or so did not materially affect the ability of the tow, as a whole, to follow the tug in a reasonably straight course. The position of the loaded stone scow on the port side astern of the fourth tier may not have been well considered, and the entire formation may have been and probably was awkward.

Viewed from a head-on position, the tow was lopsided, and it is fairly apparent that there was some angling to port. But the sketch made by the Whittelsey's captain, Cornell Ex. 4, may be relied upon to disclose all that could be said on this subject. The duty to avoid contact was mutual, and, as has been stated, the Whittelsey did not discharge her part of that obligation.

There remains to consider only the question of the presence of the helper tug Pratt on the starboard side of the Perseverance tow, at the second tier. Her beam was $17\frac{1}{2}$ feet, and, while this increased the width of the tow at the second tier to about 85 feet, that had no effect upon the situation, for the Pratt, not being made fast, passed to the west of the green buoy, to take a position on the starboard side, to hold off the tow from the Rack-A-Rock and the Boston.

This fact, in itself, indicates that the Perseverance tow was as close to the starboard hand as was reasonably to be required. It is said by some of the Whittelsey witnesses that they expected the Pratt, which was visible from the former of course, to come around to port, and straighten the southbound tow, i. e., prevent the collision.

The facts proved do not indicate that such duty was required.

Upon the entire case, it is found that the Whittelsey was at fault, and not the Perseverance. The Hustler was under the same ownership and control, and transmitted pow-

er through the hawsers by which she was made fast alongside the Whittelsey. Under the rule stated in The Anthracite (C. C. A.) 168 F. 693, and recently examined by the Fourth Circuit Court of Appeals in The Alvah H. Boushell, 38 F.(2d) 980, at page 982, the decree must be against her also.

It may be appropriate to express the appreciation of the court to both proctors for their helpful and carefully prepared briefs.

In the first cause, the libel against the Perseverance is dismissed without costs, and the usual decree may be taken against the K. Whittelsey and Hustler and their owner, with costs; the petition impleading the Pratt is dismissed, without costs.

In the second cause, the same relief in all respects is granted and upon the same terms.

In the third cause, the libel is dismissed, without costs.

Settle decrees on three days' notice.

If findings are desired, they may be settled at the same time, and are to embody appropriate recitals of ownership and incorporation.