## WINSLOW v. THOMPSON.

(Circuit Court of Appeals, First Circuit. December 22, 1904.)

### No. 556.

1. SHIPPING—CONSTRUCTION OF BILL OF LADING—DUTY AND RISK OF TOWAGE.

A provision in a bill of lading for a cargo of coal to be delivered at Portland, Me., which required the consignee "to tow vessel in and out of Back Bay free," is not a contract to pay for the towage merely, but to provide the same.

2. TOWAGE—DUTIES AND LIABILITY OF TUG.

A tug is bound to exercise proper diligence in ascertaining the condition of the channels and other waters where she assumes to tow vessels, and, if it involves any special hazard, in making it known to the tow. If she performs such duties, and damage results to the tow, which

could not have been prevented by the exercise of reasonable care and skill in the act of towing, she is not liable therefor; but, if she fails in such duties, she is liable for the consequences, whatever amount of care she may use in the act of towing, and she is also liable if, having performed such duties, damage results from her negligence in the immediate act of towing, which might have been avoided by reasonable care, notwithstanding the hazards.

3. SAME—NEGLIGENCE OF TUGS.

Tugs employed by the consignee of the cargo, who had contracted to perform the towage, undertook to tow a schooner heavily laden with coal through a channel and over a bar, where the water at the then state of the tide lacked some two feet of being sufficient for her draft at the stern. Having grounded forward, instead of drawing her off astern, as suggested by her master, they attempted to jump her over, which attempt was unsuccessfully renewed on two succeeding days, in consequence of which she was strained and injured, and it became necessary to lighten her cargo. The master of the schooner was unfamiliar with the channel, but it was well known to the captain in charge of the tugs, who knew the depth of water on the bar and the draft of the schooner. *Held*, that the acts of the tugs in persisting in their attempts to pull the schooner over the bar after she grounded were negligent, and rendered the consignee, for whom they were acting, liable for the resulting injury.

Appeal from the District Court of the United States for the District of Maine.

For opinion below, see 130 Fed. 1001. See, also, 128 Fed. 73.

Albert E. Neal (Seth L. Larrabee and William K. Neal on the brief), for appellant.

Benjamin Thompson, for appellee.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. This appeal relates to a libel brought by the master of the schooner Marjory Brown against the consignee. It claims freight, which was awarded in the District Court, and which is covered by this appeal, but as to which there is no question. It also claims damages for alleged improper towage, basing the right of action against the consignee on the provision in reference to towage contained in the bill of lading, of which the following is a copy:

**B. L. No. 17490.**          The Celebrated
Powelton Semi-Bituminous Coal.
Sterling Coal Co.
General Office: 421 *Chestnut St., Philadelphia, Pa.*
Offices:

| *New York.* | *Greenwich, Philadelphia.* |
|---|---|
| *New Haven, Conn.* | *South Amboy, New Jersey.* |
| *Boston, Mass.* | *Baltimore, Md.* |

Shipped on account of Consign, in good order by Sterling Coal Company, in and upon the Schooner called the "Marjory Brown" of whereof ——— is Master, now lying at Greenwich, Philadelphia, and bound for Portland, Maine. (Their Wharf)

Semi-Bituminous Coal

|  | In Hold | On Deck |  |
|---|---|---|---|
| Gross Tons | 1874 |  | Total |

Eighteen Hundred and Seventy-four Tons of 2240 Lbs. of Semi-Bituminous Coal, which I promise to deliver in the like good order, at the aforesaid Port of Portland, Portland, Maine, dangers of the sea only excepted, unto Winslow

& Company, or to his or their assigns; Consignees paying freight for the same at the rate of 90c & discharged & to tow vessel in & out of Back Bay free.

In witness whereof, I, the Master or Purser of said Vessel have affirmed to 4 Bills of Lading, all of this tenor and date; one of which being accomplished, the others to stand void.

Dated at Greenwich, Philadelphia, August 19th, 1903.

A. P. Thompson.

*In the margin is the following:*
Demurrage at the risk and Expense of Consignee.

The decree of the District Court awarded damages to the libelant for improper towage in the sum of $2,285.35, with interest. Thereupon the consignee appealed to us. The general facts and the issues which they raise are sufficiently stated in the opinion passed down in the court below. The appellant claims that the provision in the bill of lading relative to towing merely obliges the consignee to pay the cost of towage, but its phraseology, "and to tow vessel in and out of Back Bay free," is too clear to require or permit construction. The consignee employed a reputable and competent corporation, engaged exclusively in towing, with a competent and sufficient fleet of tugs. This, at once, suggests a question whether the remedy of the owner of the schooner was not limited to a proceeding against the tugs or their owner, on the principle that, where a contract, either on its face or by necessary implication, involves the employment of a person or corporation exercising an independent office or profession, the contracting party is sometimes relieved by using due diligence in selecting the person or corporation who is to perform such incidental work. While this issue was made in the District Court, the appellant has waived it so far as we are concerned, and it requires no further consideration.

The vessel in question was a schooner of about 1,000 tons burden, coal laden, drawing 21 feet aft. In order to accomplish her bill of lading according to its terms, she was required to pass through a short, but narrow, channel, where, at ordinary tides, there was not sufficient water for her draft. Under such circumstances, especially where there is a mere bill of lading and not a charter party, both the vessel and the owner of the cargo are held to have known, or to have waived knowledge, of the draft of the vessel and the general states of the tide to the extent that, in the event the vessel in approaching the particular place of discharge is required to await a certain stage of water, each party bears the temporary consequences thereof, so far as the consignee is delayed in receiving the cargo as soon as he may have desired to receive it, and so far as the owner of the vessel, meanwhile, loses her use. Under such circumstances, either party may lighter, but neither is required to do so. Such was the normal condition here, as there can be no question that, on a full tide, the vessel might have been towed safely through the channel in question, although the towage would have required great care.

The proposition is made by the appellant that, whatever may have been the obligation resting on the consignee by the bill of lading concerning the towage in this particular case, the towage was contracted for, not by him, but by the vessel. Some circumstances, and some statements made at bar, created an impression that, as frequently occurs, the Marjory Brown was met by a tug before arrival in the

harbor to which she was destined according to the bill of lading, and engaged towage. The later development of the facts showed otherwise, and that the order for towage came from the consignee, and not from the vessel. It is not necessary to detail the circumstances in reference thereto, as the case is too plain on this point to require it. Undoubtedly, after the order for towage was given by the consignee, there were some conversations between the master of the schooner and the representatives of the corporation owning the tugs, but these did not amount to a new contract. All that can be said is that, if there was anything definite in this conversation, it merely waived certain rights which the schooner and her master would otherwise have had against the consignee or the tugs, according as the master or the owner of the schooner saw fit to proceed against one or the other.

As a result of the conversations to which we refer, the consignee claims that the master of the schooner was advised of the condition of the channel, and thus learned that the position was hazardous, and assumed the risk in reference thereto. On the other hand, this is denied as a matter of fact, and it is also claimed that a tug engaged in general towage service cannot stipulate effectually for such an assumption; and The Syracuse, 12 Wall. 167, 20 L. Ed. 382, is relied on. Inasmuch as the law is settled beyond all question that a tug is not a common carrier, and is, therefore, obligated only for reasonable diligence, which, in view of the nature of the service, and, also, in view of the fact that ordinarily the tow is a stranger and the tug is at home, means very great diligence, The Syracuse cannot be applied to the extent claimed by the libelant. However, it will be seen that this question is not essential in the present case, wherein, as to each proposition, we will point out the general duties of the tug to her tow, and, also, show that whatever risks may have been assumed by the master of the vessel, if any, they did not cover that special negligence of the tugs which, in this case, was the approximate and true cause of the damage done.

Stated generally, the obligations resting on a tug are as follows:

First. She is "bound to know," which means only that she must use proper diligence in ascertaining, the condition of the channels and other waters where she assumes to tow vessels. The Margaret, 94 U. S. 494, 24 L. Ed. 146; The J. P. Donaldson, 167 U. S. 599, 603, 17 Sup. Ct. 951, 42 L. Ed. 292; The Belle, 93 Fed. 833, 35 C. C. A. 623; The Nathan Hale, 99 Fed. 460, 462, 39 C. C. A. 604.

Second. If the peculiarities involve any special hazard, it is the duty of the tug to make them known to the tow, so far as by due diligence the tug might have ascertained them. The Margaret, 94 U. S. 497, 24 L. Ed. 146.

Third. If she fails in her duty with reference to propositions 1 and 2, and tows a vessel into a special hazard for that vessel, the tug is liable for the consequences, if injurious, whatever amount of care she may use in the act of towing.

Fourth. If she enters on a towage involving hazards, as to which she performs her duty under propositions 1 and 2, and damage results to the tow which could not have been prevented by reasonable

diligence on the part of the tug in the act of towing, the tug is not liable therefor. The Syracuse, 12 Wall. 167, 20 L. Ed. 382; The Hercules, 73 Fed. 255, 19 C. C. A. 496; The Columbia, 109 Fed. 660, 48 C. C. A. 596.

Fifth. If, notwithstanding the tug has performed her duties under propositions 1 and 2, she enters a hazardous channel with her tow, and there is guilty of negligence in the immediate act of towage which she might have avoided notwithstanding the hazards, and injury results to the tow in consequence of such negligence during the act of towage, the tug is liable therefor.

With reference to all the above propositions, we repeat what we have already said, that reasonable care on the part of the tug means a very great degree of care. Premising that fact, we are obliged in the present case to consider only proposition 5.

The evidence was conflicting as to propositions 1 and 2. There is much ground for maintaining that the corporation which owned the tugs, and Capt. McDuffy, who was their commodore while the service was being performed, were entirely familiar with the channel and sufficiently explained to Capt. Thompson, the libelant and master of the tow, in regard to the risks involved, except only that it is not apparent that the nature of the tides was thus explained, or that he knew to what extent they bore on the conditions. The fact that the masters in immediate command of the tugs which were attending the schooner were unfamiliar with the conditions is of no special importance, inasmuch as Capt. McDuffy was present in command of the fleet. Capt. McDuffy had towed deep-draft vessels through the channel in question by pounding them over the shallow place where the Marjory Brown caught, something like 25 in all, and had sounded the channel back and forth time and time again.

Among these vessels was the Cordelia Hayes, which drew within 4 inches as much as the Marjory Brown, and with whose master Thompson had been in consultation, before he sailed for Portland, as to the nature of the channel. Another was the Clara B. Randall, drawing 20 feet 4 inches; another, the S. M. Plummer, drawing 20 feet; another, the R. F. Pettigrew, drawing 20 feet 4 inches; another, the C. E. Hayes, drawing 20 feet 8 inches; another, the E. W. Clark, drawing 20½ feet; another, the F. T. Stinson, drawing 21 feet, exactly the same draft as the Marjory Brown. All these caught and were jumped over, but they seem to have gone in on what Capt. McDuffy describes as a "good tide," a "fair tide," or a "full tide." For example, the Hayes went up when there was an 11-foot tide, and the Stinson when, as Capt. McDuffy says, "there was a good tide, 10 feet"; yet he admits that, when he went in with the Marjory Brown, there was a tide of 8 feet and 8 inches, while a fair tide is 9 feet 5 inches, and a full tide 12 feet.

Under these circumstances, it will be found that The Syracuse, 12 Wall. 167, 171, 20 L. Ed. 382, already referred to, has full application to the case. The Syracuse was being towed in the neighborhood of the Battery, New York Harbor, where, on account of the number of vessels and the currents, the conditions were difficult. The tide, also, was setting in at that time unusually strong, so that there was inevitably con-

siderable danger in taking a tow so large as The Syracuse at that particular time (page 169, 12 Wall., 20 L. Ed. 382). The answer set up (page 169, 12 Wall., 20 L. Ed. 382) that by special agreement, the tow was moved at her own risk. The construction put on this by the counsel for the tug, who was Mr. R. D. Benedict, an admiralty lawyer of very great experience, was that it amounted to a contract on the part of the tow that she would assume the hazards, "provided the steamboat which furnished the propulsive power was navigated with ordinary care and skill." This was all that he claimed, and this is practically the position taken by the court (page 171, 12 Wall., 20 L. Ed. 382), and is undoubtedly the true rule. Applying that to the present case, the result is clear, even though the tugs performed their duty with reference to propositions 1 and 2. If the schooner had merely come up with her bow on the shoal, her stern resting easily afloat, as it might have done, she would probably have suffered no substantial damage. But the injury to her did not come about in that way, as the record clearly shows.

Capt. Thompson testifies, and his testimony is not contradicted, that, after the schooner touched bottom, the tugs drew ahead for a while until the hawsers parted; that they then made other attempts, and parted their hawsers three times; that he then asked them if they could not pull him astern, and they replied that he was almost over; that he did not sound at that time, because it was almost dark; that he was drawing 21 feet aft and 19½ feet forward; that this was Sunday, the day on which the tugs took hold of his schooner; that the tugs continued to work that night for an hour or two hours after high water; that they then left him; that on Monday morning he sounded, and never found over 19 feet the whole time he lay there; that the tugs did not come to him Monday morning, because the morning tide was not so high as the evening tide; that they returned Monday evening, and drew his schooner ahead from 50 to 75 feet; that they did not get her off, although one of the tugs three times pulled apart "an eight-inch hawser, almost brand new"; that they worked that night about two hours or more; that her condition at low water on Monday night was worse than on Sunday night; that on Monday the tugs had pulled her bow over the ledge; that at low water her bow was way down, drawing 20 feet forward, and her stern up in the air; that she then had a list to port; that on Tuesday night they made another effort, but did not start the schooner at all; that the vessel was then leaking and showing some signs of strain, and had a list of 40 degrees; and that on Wednesday he made an application to the consignee, and lightering was commenced.

The injuries to the vessel, for one of her size, were not very serious. It was claimed that her lines, after she was repaired, were somewhat impaired; but no one estimated her irreparable injuries at more than $1,500 to $2,000. The repairs cost $723.15, and the final decree, so far as it relates to damages, was for $2,285.35. The nature of the injuries to the vessel, as shown after she was hauled out for repairs, including the straining and the impairment of her lines, was clearly of such a character as was caused by dragging her over the shoal on less than a full run of tides, and leaving her

on Tuesday with her bow down and her stern in the air, and with the list of which we have spoken. Capt. Thompson testified that her keel was mashed up for a distance of 125 feet; that "it showed plain enough to any one where she grounded the first night and where she grounded the second night"; that where she grounded, meaning where she grounded the first night, the keel was "mashed and squeezed right out"; that this was forward "near the forerigging, probably 10 feet aft of that"; that the next place where the indentations in the keel were deeper than elsewhere was near the spanker rigging, which, of course, was well aft; and that "these two places were mashed right down flat." The testimony given before the assessor by the master carpenter who had charge of the repairs is somewhat more in detail, but need not be repeated, as it is to the same effect. Evidently, Capt. Thompson's statement in regard to where the schooner "grounded the first night" and "where she grounded the second night" did not refer merely to her bringing up against the shoal, but to the position in which she was left by the subsequent attempts of the tugs to jump or pound her over the shoal. This is plain, because, as we have already said, he testified that the first injury to the keel was near the forerigging, "probably 10 feet aft of that." An injury could not have occurred at that place in the keel until the schooner had been well dragged up on the hard sand, or ledge, or whatever it was.

While the facts with reference to the attempts to jump or pound the schooner over the shoal, and the consequences thereof, were not brought out at the hearing at bar so fully as we have stated them, yet the result to which they lead was considered by the District Court. The learned judge of that court, in his opinion, said: "In the attempt to jump the vessel over the spot where she had grounded, there was clearly a lack of proper knowledge. There was a want of judgment on the part of the towboat captains." And the sixth error assigned is based on the finding that the corporation owning the tugs did not exercise reasonable care "in their undertaking to haul the tow off from the obstruction upon which their lack of knowledge had placed her"; while the thirteenth error assigned also is based on the finding that the schooner was at any time with her bow in 20 feet of water at low tide, with her stern in only 13½ feet of water. What was done in the way of attempting to pound the schooner over the shoal was in no manner within the rule of in extremis as to either the schooner or the tugs. There was no present danger, and there was ample opportunity for deliberation. Neither was it or its consequences, in any view of the maritime law, continuous with the towing of the vessel into the channel in question and her first bringing up against the shoal, or the proximate result thereof. It was all a new and independent condition of things and acts, with independent results clearly marked as such. As we have said, without this the case fails to show that the Marjory Brown would have suffered any substantial damage, and, especially, it fails to show that the inconsequential prior results could have been distinguished from the substantial inju-

ries which the schooner undoubtedly received in the manner we have described in detail.

Therefore, the only question which can arise is whether the attempts to pound the schooner over the shoals involved negligence, and, if yes, whose negligence. That there was an error of judgment for the consequences of which someone should be responsible, the result makes too plain to require further exposition. As we have said, Capt. Thompson testified that, when the hawsers parted, on Sunday evening, he asked Capt. McDuffy if the tugs could not pull his schooner astern, and Capt. McDuffy replied:

"No; she is almost over. It is easier to go ahead than to go astern."

In fact, Capt. McDuffy admitted as follows:

"Q. Whether, at the time the vessel grounded, Capt. Thompson made any suggestions or gave any orders? A. He gave no orders, but followed my orders; that is all.

"Q. According to your best judgment, was it the proper thing to pull the vessel ahead after she grounded? A. Yes, sir."

Undoubtedly, there was an eagerness, in a certain sense not reprehensible, on the part alike of the tugs and of Capt. Thompson, to have the schooner in her berth Monday morning. It was known that the consignee desired to discharge her that morning. It was known, also, by Capt. Thompson, that, if he did not reach his berth on that Sunday evening, he might be compelled to wait several days for more water, thus losing the use of his vessel during the intervening time. Nevertheless, the evidence to which we have referred shows that the responsibility was assumed by the tugs. So far as Capt. Thompson is concerned, it may well be said that on Sunday evening he had no opportunity of understanding the conditions and the probabilities; but, when on Monday he had got his soundings, and had had the day for deliberation, it seems strange that he should have consented to the further attempts of the tugs to pound his vessel over 2 feet of hard sand, or ledge, or whatever it was, being the difference between his draft, 21 feet, and the result of the set of the tide, 19 feet. It might seem that, in consequence of his not ordering the tugs to cease from their attempts, he shared in the responsibility, so that there was double negligence. Nevertheless, no position of that kind was taken in the answer or urged in the District Court, and, therefore, none such is before us. It must be remembered that Capt. Thompson was probably not fully informed as to the relative conditions of the tide. Moreover, the relations of a tug to her tow, as understood in the United States, are often likened to the relations of a pilot, and, indeed, a tug, according to the practice in the United States, may be both tug and pilot. The duty of a master to withhold himself from interfering with the orders of a pilot, except in extreme cases, is well understood. Several observations bearing on this topic appear in Abbott's Merchant Ships and Seamen (14th Ed. 1901) 302, 303, 304. A reference is there made to an expression by Sir James Hannen, that:

"If a master allows a pilot to move his ship when, in consequence of a fog, there is a clear and plain prospect of danger, the master cannot throw the whole blame on the pilot."

Nevertheless, the text admits that it is generally the pilot's duty to decide when the vessel shall get under way. The text also states that, if a pilot reports that, under all the circumstances, the danger of leaving the ship in an existing position is greater than any danger to be expected from moving her, the master would be under-taking a serious responsibility in refusing to obey the pilot's orders. It continues, at page 302:

"In fact, it is suggested that, to justify such a refusal, the master must be prepared to prove that the pilot's orders were reckless, while the master can hardly be to blame for obeying the pilot, unless, with all the means of knowledge at his command, he must or ought to have known that the orders were reckless."

The same proposition is stated to the same effect at pages 303 and 304, by citations from opinions of Dr. Lushington. The result is that, in view of the fact that the tugs were in control of the position, on the same rules which apply to a pilot, it is very doubtful whether Capt. Thompson would not be fully excused for his acquiescence; but, however this may be, for the reasons we have already stated, this topic is not before us. The result is that the consignee must be held responsible for the damage which occurred in the way we have explained; and the decree of the District Court must be affirmed.

Two questions are raised by the assignment of errors with regard to the damages allowed by the assessor and decreed by the court. The first seems to be to the effect that there was not sufficient, or even proper, evidence as to the amount expended for repairs. This was shown, in the ordinary manner, by a bill of items which was produced before the assessor, and, in a general way, by the testimony of the master carpenter, which was proof enough. It is not shown that any objection as to the mere method of proof was made before the assessor, and the rule has been announced over and over again that, ordinarily, such objections cannot for the first time be taken later. The other question is as to the rate at which the vessel's demurrage during the repairs was computed. We see no evidence that it was unreasonable.

The decree of the District Court is affirmed, with interest; and the appellee recovers his costs of appeal.