CONSOLIDATED COAL CO. v. KNICKERBOCKER STEAM
TOWAGE CO. et al.

(District Court, D. Maine. November 4, 1912.)

No. 174.

1. TOWAGE (§ 11*)—GROUNDING OF TOW—LIABILITY OF TUG.

A towage company, having the only tugs in service on the Kennebec river, undertook to tow a loaded coal barge through a dangerous passage in the river, where a dredging company had been at work, but had stopped, leaving the work uncompleted, and leaving rock and other material on the bottom, so that there was not sufficient depth of water for the barge, and she grounded and was injured. The towage company knew of the dredging operations, but made no examination or inquiry to ascertain the depth of water left or the condition of the bottom. *Held*, that it was bound to know such facts, and was chargeable with negligence which rendered it liable for the injury to the tow.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

2. TOWAGE (§ 11*)—CARE AND SKILL REQUIRED OF TUG.

While a tug is not an insurer of the safety of her tow, she is held to the use of the reasonable care exercised by ordinarily prudent mariners engaged in such service, which is measured by the dangers and difficulties to be encountered; and when the service is performed in the home port of the tug, or on a river where the towage company is the only one engaged in like service, a much greater degree of care is required in ascertaining the depth of water and the character of the bottom.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

3. NAVIGABLE WATERS (§ 25*)—OBSTRUCTION BY DREDGING COMPANY—LIABILITY FOR INJURY TO VESSEL.

Where a dredging company, under contract with the United States to excavate the bottom of a narrow and dangerous channel in the Kennebec river through a rocky ledge to a depth of 18 feet, temporarily left the work when only partly completed, leaving the bottom obstructed by loose rock thrown out in blasting, so as to reduce the depth to only about 11 feet, without marking the place or giving notice of its condition to the government or navigators, it was chargeable with negligence, and liable for injury to a barge by grounding while being towed through the passage.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 65; Dec. Dig. § 25.*]

4. EVIDENCE (§ 77*)—PRESUMPTIONS—FAILURE TO CALL WITNESS.

The failure of a party to call as a witness an employé who had knowledge of the matters in issue warrants a presumption unfavorable to the contentions of such party.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 97; Dec. Dig. § 77.*]

In Admiralty. Suit by the Consolidated Coal Company against the Knickerbocker Steam Towage Company and the Eastern Dredging Company. Decree for libelant against both respondents.

Benjamin Thompson, of Portland, Me., for libelant.

Will C. Atkins, of Gardiner, Me., for respondent Knickerbocker Steam Towage Co.

N. & H. B. Cleaves, Stephen C. Perry, and Robert T. Whitehouse, all of Portland, Me., for respondent Eastern Dredging Co.

HALE, District Judge. The libelant's barge No. 8 left Bath on the morning of July 7, 1910, loaded with a cargo of 1,417 tons of coal, drawing 15.9 feet forward and 16.9 feet aft, in tow of the Perry, a steam tug of the Knickerbocker Steam Towage Company. The tug had undertaken to tow the barge to Gardiner, her port of discharge. Upon reaching a point nearly in the center of the Kennebec river at Lovejoy's Narrows, about 12 miles from Bath, and while passing over that part of the Narrows known as Old Dry Rock Ledge, the barge struck her port bow on an obstruction. She slewed out about 2 feet forward, and listed about 2 feet to starboard, and began to leak. She remained grounded about three-quarters of an hour, when she was floated off by the tide and towed to her destination at Gardiner. The libel alleges that the injury occurred in consequence and by fault of the towboat, and also by reason of an obstruction left in the Narrows by the Eastern Dredging Company while at work under a contract with the United States for the improvement of navigation at that point. The libelant charges the Towage Company with negligence, in that it attempted to tow the barge through Lovejoy's Narrows, and grounded her on a shoal on the southwesterly part of Old Dry Rock Ledge, where there were at least 3½ feet less water than there had been before the commencement of work by the Dredging Company, and at least 6½ feet less than the Towage Company expected to find at the time of the grounding, and that the Towage Company did this with knowledge that changes had been made in the bottom of the Narrows, but without knowledge, or inquiry, whether the Dredging Company had completed its work, or in what condition it had left the river bottom, and without knowledge whether there was enough water to permit the safe passage of the barge.

The libelant charges the Dredging Company also with negligence in that, after blasting on the southwesterly part of Old Dry Rock Ledge, it stopped work and left the place, without cleaning up the rock thrown up by the blasting, and without causing soundings to be made to ascertain the condition of the bottom, and without exercising care in marking the dangerous locations of the obstructions caused by such blasting, and without giving notice to vessels navigating the river of the dangers to which they would be exposed in passing over that part of the Narrows. And the libelant alleges that in consequence of such negligence on the part of the Dredging Company, the barge grounded at a point where there were only 11.6 feet of water at low tide, and where there had previously been at least 14.9 feet of water.

[1] 1. Was the Towage Company at fault for negligent towage?

Its tugs were the only steam tugs engaged upon the Kennebec river in towing vessels of the class of barge No. 8. The testimony tends to show that neither the manager of the Towage Company, nor the master of the tug, nor any one of her crew, had any accurate knowledge of the condition of Lovejoy's Narrows at the time the towage service was undertaken. It appears from the evidence that the Tow-

age Company was satisfied with the inquiries made by it of the Dredging Company from time to time as to the depth of water and the condition of the dredging work in the channel. Its answer alleges that it did not know that the Dredging Company had left the location without removing the results of its blasting; that it supposed and understood that there were no dangerous places left; that it understood further that the Dredging Company's work was completed, and that the bottom was all right, and that there were 18 feet of water in the Narrows; that it was so informed by the representatives of the Dredging Company; and that the Towage Company's employés made various soundings and found no shoal spots. Mr. Ballard, the manager of the Towage Company, testifies that, before the Dredging Company stopped work in the Narrows, he never personally made any examination in the river; that, from the time the dredging was stopped in June to the time the barge took bottom, he does not know that Capt. Tarbox, the master of the tug, made any soundings in the Narrows, although at the time the towage service was undertaken he knew the dredging had been completed, and understood that there were 18 feet of water over Old Dry Rock Ledge; that, after the injury, he went to the Narrows and had soundings made, finding the shoalest place 13.6 feet; and that he had supposed and understood that the water was 18 feet deep at places where it was found to be only 13.6 feet. Capt. Tarbox, the master of the Perry, testifies that he did not make any soundings after the Dredging Company left, to ascertain whether it had completed its work, and that he does not know whether anybody else had made any such soundings for the Towage Company, between the time the Dredging Company left the work in June, and July 7, 1910, the time of the injury; that he thought there should have been water enough at that particular time to have gone safely through with the barge; that he did not know about this Old Dry Rock Ledge, which is shown on the plan to have 14 feet of water upon it at low tide, but he knew there was a rock at the bottom; that he had never heard it called "Old Dry Rock Ledge"; that he had made no inquiries at the engineer's office to ascertain what changes had been made in the bottom of the river; that after the dredging was completed he made no inquiries of anybody, but that he looked for 17½ to 18 feet of water in the Narrows in the shoalest part at the time of the injury. The whole testimony upon this point induces the belief that the steam tug undertook to tow the barge through a dangerous passage in the Kennebec river, knowing the draft of the barge, and knowing that the bottom had for some time been undergoing changes from dredging, but without making accurate examination of the depth of water left after the dredging service was completed. The whole testimony induces the belief that, if the Towage Company had made examination or inquiry, it could not have failed to learn that the Dredging Company had not completed its contract. I am of the opinion that, in consequence of this want of knowledge, the barge was towed by the Towage Company upon rocks left there by the Eastern Dredging Company nearly a month earlier than the date of the injury. I am also of the opinion that, by the exercise of the reasonable

care of the ordinarily prudent navigator, the Towage Company would have been advised of the condition of the bottom, and the lack of water at the place of the injury. Having undertaken to tow the barge through the dangerous channel described, the Towage Company was bound to know its dangers, and to use the degree of care necessary for the purpose of avoiding those dangers.

[2] This court has often had occasion to examine questions relating to the legal obligations of a steam tug to its tow. It may be stated generally that, while a steam tug is not an insurer of the safety of her tow, she is held to the use of the reasonable care exercised by ordinarily prudent mariners engaged in such service, and that such care is to be measured by the dangers and difficulties to be encountered. When the towage service is performed in the home port of the steam tug, or upon a river like the Kennebec, where the Towage Company is the only one engaged in towing large vessels, a much greater degree of care is required in ascertaining the depth of water and the character of the bottom.

In The Naos (D. C.) 144 Fed. 292, the court in this circuit reviewed the law upon this subject. Winslow v. Thompson, 134 Fed. 546, 67 C. C. A. 470; The Adelia, Fed. Cas. No. 79; The Effie J. Simmons (D. C.) 6 Fed. 639; The Henry Chapel (D. C.) 10 Fed. 777; The Somers N. Smith (D. C.) 120 Fed. 569. The Supreme Court has passed upon this subject in The Margaret, 94 U. S. 494, 497, 24 L. Ed. 146, Davidson Steamship Co. v. United States, 205 U. S. 187, 194, 27 Sup. Ct. 480, 51 L. Ed. 764, and Atlee v. Packet Co., 21 Wall. 389, 396, 22 L. Ed. 619. In Susquehanna Coal Co. v. Eastern Dredging Co., 200 Fed. 817, an opinion was handed down by Judge Dodge in the Massachusetts district, in July, 1908, which does not appear to have been published, in which he says:

"The Devon was without motive power of her own, her navigation was wholly under the tug's control, all her movements were subject to the tug's direction, and there is no suggestion of any independent action on the Devon's part, having a tendency to cause her to run aground. Under such circumstances, the fact that the Devon grounded raises a presumption that the tug was negligent, as in Burr v. Knickerbocker, etc., Towage Co., 132 Fed. 248 [65 C. C. A. 554], and The W. G. Mason, 142 Fed. 913, 915 [74 C. C. A. 83]. The burden is on the tug to explain the cause of the disaster."

In The Murell, 200 Fed. 826, January 10, 1911, Judge Dodge held that the tug was bound to know the risks attending the attempt to take the barge through a dangerous passage, and was bound to use the degree of care and skill necessary to avoid those risks. He followed the same line of reasoning as in Susquehanna Coal Co. v. Eastern Dredging Co., although he states the familiar rule that damage to a vessel while being towed does not, under ordinary circumstances, raise a presumption of fault on the tug's part.

In cases where the cause of the injury is obscure, it has often been held that the result is a safe test by which to judge the character of the act causing it, as was stated in The Steamer Webb, 14 Wall. 406, 414, 20 L. Ed. 774, and it is often held that unusual circumstances connected with the grounding of a vessel put the burden upon the tug

to explain the reason of the grounding, as in the cases cited by Judge Dodge. In the case at bar, however, the cause of the injury was not obscure. A fair preponderance of the evidence induces the belief in my mind that the tug was at fault. The case may be decided upon the ordinary principles followed in other cases cited in this circuit. In The Adelia, Fed. Cas. No. 79, one of the early cases in this district, Judge Fox followed The Steamer Webb, 14 Wall. 406, 414, 20 L. Ed. 774, The Steamer Syracuse, 12 Wall. 167, 171, 20 L. Ed. 382, and Transportation Co. v. Downer, 11 Wall. 129, 134, 20 L. Ed. 160. As I have indicated, the whole testimony leads me to the conclusion that the Towage Company was negligent in undertaking the towage service without sufficient knowledge of the dangers attending it. It was at fault, too, in that, while in command of a master of insufficient knowledge with reference to the place where the towage was to be performed, and without proper investigation of the condition in which the Dredging Company had left the bottom, the tug undertook to tow so large a vessel as the barge through a place of well-known dangers.

In its answer the Towage Company seeks to limit its liability, if any, to the value of the steam tug Perry, and its right to such limitation does not appear to be disputed. It seems to be assumed that the damages sustained by the barge considerably exceed the value of the Perry. I suppose further evidence will be brought before the court touching the value of the Perry.

[3] 2. Was the injury to the libelant's barge occasioned also by the fault of the Eastern Dredging Company?

The duties and liabilities of the Dredging Company arise under the general principles of law. But the contract of that company with the United States, to which I have already referred, has some suggestive, and indeed probative, value. Under this contract the Dredging Company was to excavate certain portions of the ledge in the bottom of the river at Lovejoy's Narrows, in order to bring it down to a depth of 18 feet at low water. The contract provided that:

"The contractor will not be allowed to unnecessarily obstruct or inconvenience navigation at any time, * * * and he shall at all times leave a practicable open channel way for vessels through the Narrows. The contractor shall be responsible for any failure or neglect of the above requirements."

In another section it is stated:

"The channel through Lovejoy's Narrows is narrow and crooked, and the currents at times are quite swift, making navigation difficult at this locality."

By the testimony of the manager of the Dredging Company, it appears that the Narrows is an irregular passage with sharp turns; that there is a strong current through there at certain times of the tide, with more or less eddying spots; that such a current affects the steerage of vessels; and that the place is well understood to be difficult of navigation in going up or coming down, especially if the tide is with the vessel. The rise and fall of the tide at that point is from 5 to 7 feet.

[4] The dredging was carried on by use of a drill boat called the Rockport, a vessel 65 feet in length, by 25 feet beam. By use of this drill boat, holes were put down in the ledge at the river bottom, and into those holes sticks of dynamite, averaging six pounds to the stick, were inserted and exploded. The effect of the blasting at Old Dry Rock Ledge was to shake up and disintegrate the rock; and, after this had been done, the contract required the rock so dislodged to be picked up and deposited at some designated point. There is some conflict of testimony touching the effect of this submarine drilling and blasting. The proofs in behalf of the Dredging Company show that the effect of the blasting depends upon the rock foundation and the amount of the explosive used. It is clear that, as a result of the explosions at this point, the rock was thrown up, and the evidence indicates that some of the rock, so thrown up, fell back out of position; and some went back to its old place. The evidence of the United States assistant engineer, and other competent testimony, induces me to believe that, with such blasting as was done at the Narrows, a great part of the ledge would not fall back into its old compact position, occupying no greater space than it did before. It is clear that, by the explosion, more, or less loose rock was exposed. It must be said here that one Mr. Saxild had been constantly at work on the bottom in behalf of the Dredging Company, and must have known from actual observation and experience precisely what effect the quantity of explosives actually used had upon the bottom. He was cleaning up the rock through the center of Old Dry Rock Ledge upon the last day the Dredging Company's plant was in use, before it left on June 16th, and was in the employ of the Dredging Company. He was not called. The effect of his not being called necessarily creates some presumption in the mind of the court unfavorable to the contention of the Dredging Company upon this point, as in The Steamer Southern Belle, 18 How. 584, 588, 15 L. Ed. 493, The Fred. M. Laurence (D. C.) 15 Fed. 635, 637, The Alpin (D. C.) 23 Fed. 815, The Bombay (D. C.) 46 Fed. 665, 667, and The Georgetown (D. C.) 135 Fed. 854, 859. The whole testimony upon this point, taken together, induces the belief in my mind that in June, 1910, while blasting on the southwesterly part of Old Dry Rock Ledge, the Dredging Company threw up the bottom at that place so that there were only about 11.6 feet where, before the work, there had been at least 14.9 feet, and that the Dredging Company left the location and went elsewhere, without making suitable investigation of the condition in which the bottom had been left, and without marking the dangerous location where the work had been done, nor calling the attention of the government to the necessity for buoys at that point, nor giving notice of the situation to those engaged in navigating the river.

Precisely where the grounding of the barge occurred is a matter of sharp contention. Upon the whole evidence, I am of the opinion that the grounding occurred near the center of the river, where vessels of this character had previously gone without injury, and where a shoal had not existed previous to the dredging in June, 1910. After such dredging had been completed, the company was notified by letter

of the United States engineer that dangerous shoals had been left on Old Dry Rock Ledge in Lovejoy's Narrows, that the depth of water over those shoals was only 13 feet, and that the Dredging Company must undertake the removal of the obstruction. The testimony tends to show that this letter was written before certain sweepings were made on June 16, 1910, and before the government engineer knew that these dangerous shoals were only 11.6 feet, instead of 13 feet, under water.

The testimony leads me to the belief that prior to the cessation of work on the part of the Dredging Company on June 10, 1910, all the blasting of the southwesterly part of the ledge necessary to complete the contract was done, and that none of the rock which had been thrown up from the bottom at that point during the dredging had been removed; and yet the Dredging Company had abandoned the location and left the place of their work, without making a suitable examination of the effect of the blasting. I am persuaded that, as the result of such blasting, shoals were created of a dangerous character, and that sufficient notice was not given to those navigating in that location.

I am convinced by the proofs that the Dredging Company did not give the government sufficient information of the condition of the bottom when it left the work, so that the government could adopt such precautions to warn navigators as the conditions required. It seems clear that the Dredging Company should have ascertained the state of the river bottom at the locality where the blasting was done, and, if it became necessary to suspend the work, that company should have applied to the government for permission to place buoys there; and that it was its duty to do this in the exercise of reasonable care, under all the circumstances; for the object of dredging was to improve the navigation of the river, and not to impose an added danger.

In Philadelphia, Wilmington & Baltimore R. Co. v. Philadelphia, etc., Co., 23 How. 209, 16 L. Ed. 433, in speaking for the Supreme Court, Mr. Justice Grier said:

"It is a rule of maritime law, from the earliest times, 'that if a ship run foul of an anchor left without a buoy, the person who placed it there shall respond in damages.'"

This case arose out of damages caused by concealed piles in navigable waters. See, also, Casement v. Brown, 148 U. S. 615, 623, 13 Sup. Ct. 672, 37 L. Ed. 582. The duties of contractors with the government in this behalf are not measured by their contract; such duties to third persons are independent of their contractual relations. Harrison v. Hughes, 125 Fed. 860, 864, 60 C. C. A. 442; Erie, etc., v. City of Chicago, 178 Fed. 42, 101 C. C. A. 170. Such contractors are under the duty to mark obstructions which they are compelled to leave, and to give suitable notice. The H. S. Nichols (D. C.) 53 Fed. 665, 668.

In the recent case, Red Star Towing & Transportation Co. v. Snare & Triest Co. (C. C. A.) 194 Fed. 672, in speaking for the Court of Appeals for the Second Circuit, Judge Noyes said:

"Authority to obstruct a navigable stream by building the abutments of a bridge, which can be seen and avoided, is not authority to leave such abutments when unfinished and below the surface of the water, without any mark or warning. Authority to obstruct navigable waters by building a breakwater is not authority to leave the new construction without a light. Harrison v. Hughes, 125 Fed. 860 [60 C. C. A. 442]. Authority to store piles at the side of a creek or river is not authority to allow them to remain submerged at high water without any buoy or other mark. In other words, it does not follow from the fact that the respondent was authorized to place the piles where it did that it owed no obligation with respect to them. On the contrary, it was bound to so mark them that vessels navigating the creek would not run upon them without warning; and, in our opinion, this duty was not affected in the slightest degree by the fact that the piles were placed between high and low water mark. They constituted an obstruction to vessels navigating the creek at high water and such vessels were entitled to protection."

See Inland, etc., Coasting Co. v. The Commodore (D. C.) 40 Fed. 258; North American Dredging Co. v. Pacific Mail S. S. Co., 185 Fed. 698, 701, 107 C. C. A. 620.

I think, too, that the Dredging Company cannot successfully maintain that vessels could have been towed in safety in some part of the channel. In Omslaer v. Philadelphia Co. (D. C.) 31 Fed. 354, 361, the court said:

"My conclusion from the proofs is that while the Iron City, at the time the disaster overtook her, may not have been in the very deepest part of the channel, she yet was in navigable water, and where she had a perfect right to be. From no portion of the river then navigable by the boat could the defendant company lawfully exclude her."

See, also, The Mary S. Lewis (D. C.) 126 Fed. 848, 852.

I am constrained by all the testimony to find that the Dredging Company did, in the language of the contract, unnecessarily obstruct and inconvenience navigation, and that, under all the circumstances, it must be held to have been at fault. It is therefore liable for the damages sustained by the libelant's barge.

3. Was the libelant's barge No. 8 properly manned and diligently navigated at the time of the grounding?

There was much conflict of testimony upon this subject. The evidence shows that, at the time of the injury, the barge had just come off the railway. She was 193½ feet in length, and 34 feet beam; she had a carrying capacity of 1,600 tons. At the time of sailing she was carrying a little over 1,400 tons of coal, and was drawing 15.9 feet forward and 16.9 feet aft. Her build rendered her somewhat hard to tow. The Towage Company, however, was familiar with the difficulties attending the towage of barges through those parts of the river, where sharp turns were to be made, and currents were to be overcome.

The tug attempted also to tow her with a long hawser. The evidence convinces me that the details respecting the manner of performing the towage service, the way the tug should be made fast, the length of the hawser, the speed at which the tow should be moved, were all determined by the master of the tug.

The whole testimony induces the belief that the barge substantially followed the course pursued by the tug, and that, if there was any sheering on the part of the barge, or any failure to follow closely in

the wake of the tug, this was due to the improper length of the towing hawser, and to the failure of the master of the tug to properly use the speed bell when he saw the barge was not swinging quickly.

There is no necessity for discussing in detail the testimony touching this point; I merely state the result. I am satisfied, upon the whole, that the libelant's barge was not at fault.

4. The court holds, then, that the libelant is entitled to a decree against the Eastern Dredging Company for a moiety of the damages suffered by the libelant, and for a moiety of the costs. The libelant is also entitled to a decree against the Knickerbocker Steam Towage Company for a moiety of the damages, and for a moiety of the costs. If either of the said parties respondent shall be unable to pay such moiety, both of the damages and of the costs, then the libelant shall have a remedy over against the other party for any balance thereof which may remain unpaid. An interlocutory decree may be entered consistent with this opinion. Fritz H. Jordan is appointed assessor. And he is directed to fix the libelant's damages, and also to report the value of the steam tug Perry, and of her pending freight, at the time of the injury. Upon the coming in of the assessor's report, I will direct the settlement of the final decree.