PENNSYLVANIA R. CO. v. GOLDEN et al.

(District Court, D. Massachusetts. May 23, 1917. Opinion on Costs, August 10, 1917.)

No. 711.

1. TOWAGE ⟨⇒⟩12(2)—STRANDING OF TOW—LIABILITY.

The stranding of a loaded coal barge, while being towed up the Taunton river, Mass., by a steam lighter employed by respondents, who were consignees of her cargo, and were having the barge taken up from Fall River, *held* to have been due to the fact that the lighter was not of sufficient power, and also to faults on the part of both vessels; the lighter being in fault for using too long a line for towing in a narrow and winding channel, and the barge in that her master, when passing around a bend to starboard, starboarded his wheel, and, the lighter being unable to control her, ran the barge into the opposite bank.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 29.]

2. ADMIRALTY ⟨⇒⟩122—COSTS—RECOVERY OF PART DAMAGES.

Under the established rule in the First circuit, where libelant alone has sustained damage, and there is no cross-libel or counterclaim, in the absence of peculiar circumstances the libelant is entitled to recover full costs, even though he recovers only half damages.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 797–827.]

In Admiralty. Suit by the Pennsylvania Railroad Company against Michael C. Golden and Henry A. Noyes, doing business as the People's Coal Company. Decree dividing damages.

Burlingham, Montgomery & Beecher, of New York City, and Edward S. Dodge, of Boston, Mass., for libelant.

D. Gardner O'Keefe, of Taunton, Mass., for defendants.

HALE, District Judge. The libelant is the owner of barge P. R. R. No. 720, and seeks to recover damages sustained by that barge, resulting from stranding off Peters Point in Taunton river, while in tow of the steam lighter Kelpie, June 10, 1911. The barge is a coal-carrying vessel of 500 tons' capacity, 150 feet long, 22 feet beam, $8^9/_{10}$ feet depth of hold. The Kelpie is a steam lighter of 43 gross tons, constructed for carrying freight. She has, however, been used for towage purposes. At the time in question she was drawing 7½ feet of water. The tug was drawing 5 feet 2 inches to 6½ feet of water. The Kelpie was hired by the respondents, the consignees of the cargo of coal on the barge. The libelant contracted with the New England Transportation Company, owner of the tug Resolute, to tow the barge as far as Fall River; she being one of several barges used in conveying coal from South Amboy to Taunton. At Fall River the responsibility for towage on the part of the New England Transportation Company ceased. It was then agreed that the respondent should have the privilege of discharging all the barge's cargo at Fall River, or lighten her at that point, and, if they chose, tow the barge from Fall River to Taunton and return. Towage from Fall River to Taunton was to be furnished by the respondents. The duty, then, was on the respondents to provide towage, as in Thompson v. Winslow (D. C.) 128 Fed. 73, affirmed 134 Fed. 546, 67 C. C. A. 470.

⟨⇒⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

On June 11, 1911, the tug Archer took the barge in tow from the dock of the respondents at Fall River, and towed her a short distance above the Dighton Stove Works. The barge was brought back, however, and left at the Dighton Stove Works on the same day. On the morning of June 10th, by arrangement with one of the respondents, the Kelpie came to the wharf at the Dighton Stove Works, where the barge had lain overnight. The Kelpie took the barge in tow, with the purpose of towing her to her destination at Taunton. One of the respondents contracted to have Capt. Fred Staples take charge of the Kelpie in towing the barge up the river. Capt. Staples was not the master of the barge, but was placed in charge of her on this trip, although Capt. Yutz, the regular captain, of the barge, was on board. Capt. Staples was an experienced navigator, 83 years old, and has been retired from active service for some years. By direction of Capt. Yutz of the Kelpie, the line was passed from the tug and was made fast to the barge, bridle fashion, leading through the chocks on both bows. The hawser was estimated, by the master of the barge, to be from 25 to 40 feet long; the two vessels were about 18 to 20 feet apart. The first turn above the Dighton Stove Works was a turn to port. The tug and tow proceeded around this turn without difficulty. The next bend in the river was a turn to starboard at Peters Point. Here the barge stranded on the port side of the channel. The libelants allege that the tug was in fault for having too long a hawser, and also that she was not a suitable vessel to undertake the tow, in that she did not have the necessary power, and that, on account of such lack of power, she failed to keep steerageway, while making this turn. A sharp contention is made upon these two points. Other faults are also alleged against the tug. The respondents urge that the stranding was caused by no fault of the tug, but for the reason that, at this turn in the river, the master of the barge put his wheel hard-astarboard, instead of putting it hard-aport, as he should have done to follow the tug.

It is not necessary to recite all the evidence relating to the stranding The testimony makes it clear that, when the tug and tow arrived at the sharp turn to starboard, at Peters Point, they were proceeding very slowly. The tug there lost control of the barge. This loss of control was, I think, due, at least in part, to the low power of the tug, which made it necessary to use a longer hawser than can safely be used in a river where there is a narrow channel and where turns are encountered. In such a locality the evidence in the case, and the experience of mariners, make it clear that there ought to be very little chance given for a towed vessel to swing. If this tug had been towing with a very short hawser, I am satisfied from the evidence that it could have kept the barge under control. I think she could have done this, regardless of what the barge captain did with his wheel. There is some evidence tending to show that the barge had been towed by the same tug, over this same course from Fall River to Taunton, on some previous occasion, but that the towage was then done with a short hawser. Having undertaken to tow the barge through a narrow and dangerous channel, the tug was bound to know the danger, and to use the care and the appliances necessary for the purpose of avoiding it. The tug was the

243 F.—17

controlling agency. She had the responsibility for the movements of both vessels. If she had not power enough to take the barge safely up the river, she should not have attempted the service. If, on account of her low power, she was required to use a longer hawser than safety would permit, in the narrow, bending river, it must be held to be at fault for such use. I must come to the conclusion that, if the tug had been a higher powered vessel, and been using a very short hawser, she could have controlled the barge. I think these faults on the part of the tug were causes contributing to the disaster.

Was the barge also at fault? The respondents say that the tug headed straight for Peters Point and passed 40 or 50 feet outside of it, the barge following straight after. She was under very little headway. When the tug had got by the point, the barge was close to the point, and a little to the eastward of the middle of the channel, but in the best water. At this time the captain suddenly threw his wheel two-thirds of the way over to starboard. The barge took a sheer to the port. The captain of the tug sung out to the barge captain, "Steady the wheel or you will go ashore." There was no response from the barge. Substantially this account is given by Capt. Yutz and by Capt. Haskins, an impartial witness who was in a rowboat pulling an eel trawl about 150 or 200 feet from where the barge went ashore. Capt. Savage, of the barge, says he put his wheel aport. He denies putting it to starboard, as the witnesses for the respondents say he did; but it must be said that Capt. Savage's statements since the disaster have not been altogether consistent. Fifteen minutes after the disaster the rudder was found hard to port.

On the whole, the preponderance of evidence leads me to the conclusion that, when the tug and tow arrived at the turn, the captain of the barge, appearing to think that he was too near the shore on the easterly side, put his wheel to starboard, and thereby contributed to the injury. The vessels were then proceeding with very little steerageway. At the time Capt. Yutz shouted to the barge captain to steady the wheel, if the tug had been towing with a short hawser, she could have handled the barge, I think, and have prevented a sheer.

I think both the tug and tow must be held to have been at fault. It is not necessary to decide whether one negligence supervened upon the other. Thompson v. Winslow, 134 Fed. 546, 67 C. C. A. 470. It is apparent that there were two faults concurring at the time of the disaster.

With this view, I direct that the damages be divided, apportioning to each party one-half of the damages and one-half of the costs. The case is referred to Albert T. Gould, Esq., Boston, Mass., to assess the damages and report to this court.

### Opinion in the Matter of Costs.

[2] This libel is brought by the owner of a barge to recover damages sustained by the barge resulting from stranding, while the barge was in tow of a steam lighter. There was no cross-libel and no counter-claim. The barge sustained injury. There was no injury sustained by the tug. I held that there were two faults concurring at the time

of the disaster. The libelant alone suffered damages. I directed that the damages be divided, and, at first, apportioned one-half of the damages and one-half of the costs to each party. Upon having my attention called to the practice in this circuit I have changed my decree in this respect. I think it proper that, under the circumstances, the libelant shall recover full costs. I find nothing in this circuit which changes the rule of Judge John Lowell, in The Hercules in 1884. (C. C.) 20 Fed. 205. In The Mary Patten, 2 Lowell, 196, Fed. Cas. No. 9,223, Judge Lowell stated the reason of the rule:

"It is the ordinary case of a prevailing party recovering less than he asks for; and if there has been no tender or offer of amends, and no equity peculiar to the individual case, it is according to the sound and reasonable law of all courts that he should recover costs."

In 1902 Judge Francis Lowell followed this rule in an unreported case. Nantaskett Beach S. S. Co. v. Steamship Yarmouth. In his opinion, he cites The Hercules, and says that case must be taken to determine, in this circuit, where there is neither cross-libel nor counterclaim, that the libelant will, in the absence of peculiar circumstances, recover full costs, even though he recover one-half damages.

Other circuits have observed a different rule and have divided costs in all cases where damages are divided. This has not been the general practice in this circuit, although it is true that there have been instances where costs have been divided in cases of this sort, it being obvious that the matter had not been called to the attention of the court; but I feel compelled to follow the rule which has generally been followed by courts in this circuit since 1884, so far as the matter has been called to my attention.

Of course, it is not disputed that the court has discretion in each individual case to regulate costs, according to the equity in that case. For this reason the general rule is of less consequence than it otherwise would be.

In The Horace B. Parker, 76 Fed. 238, 22 C. C. A. 418, the Court of Appeals in this circuit divided the costs, although there was no cross-libel, but only a counterclaim. It is apparent that the Court of Appeals did not intend to overrule Judge Lowell's opinion in The Hercules.

In The Gladiator (D. C.) 223 Fed. 381, a counterclaim was filed after the assessor's report was returned to this court, and the costs were divided accordingly.

In this district, in Union Ice Company v. Crowell, 55 Fed. 87, 90, 5 C. C. A. 49, Judge Webb followed the practice of this circuit, and gave full costs, although dividing the damages, there being no counterclaim, no cross-libel, and no injury suffered except by the libelant.

Before changing my decree in regard to the costs, I called the learned proctors in this case before me and heard full arguments touching the matter; after such arguments and full consideration of the question, I am of the opinion that I must be bound by the practice in this circuit, and must follow the general rule in cases of this character, that, if the loss is all suffered by the libelant, in the absence of peculiar circumstances, that party will recover full costs, even though he shall recover but one-half damages.

As I have said, the court has full power to regulate each case according to·the facts disclosed in the case. I find no facts disclosed in this case which should vary the general rule.

The order may be entered that the libelant recover full costs.