GREAT LAKES TOWING CO. v. ALVA S. S. CO. et al.

GREAT LAKES DREDGE & DOCK CO. v. SAME.

(Circuit Court of Appeals, Seventh Circuit. October 7, 1919.)

Nos. 2655, 2676.

1. TOWAGE ⬤⟿11(1)—RELATION AND DUTIES OF TUG TO TOW.

The master of a tug, undertaking to tow a vessel in a home port, is bound to know the proper and accustomed waterways and channels, the depth of water, and natural formation of the bottom, whether in its natural state or as changed by permanent excavation, and is chargeable with notice of recently changed conditions, either in channels or harbors, if means of knowledge exist and are available to him.

2. TOWAGE ⬤⟿11(5)—LIABILITY OF TUG FOR GROUNDING OF TOW.

Two tugs held liable for injury to a steamer and cargo from boulders on the bottom of Calumet river, through which it was being towed, where the steamer was strange to the locality and loaded within what it was assured by the towing company was a safe limit, and where the company by proper inquiry should have known the depth of the channel.

3. NAVIGABLE WATERS ⬤⟿8—OBSTRUCTION BY BOULDERS IN CHANNEL; LIABILITY OF DREDGING COMPANY.

A dredging company, under contract with the government to dredge a river channel and whose work was uncompleted, held not liable for the grounding on boulders of a steamer passing through, where it did not appear that it was in fault for the presence of the boulders, or that its work had lessened the depth of the channel.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit by the Alva Steamship Company and the Bartlett-Frazier Company against the Great Lakes Dredge & Dock Company, in personam, and in rem against the tugs W. A. Field and North Harbor; the Great Lakes Towing Company, claimant. Decree for libelants against both respondents, and they separately appeal. Affirmed in part, and reversed in part.

Appellee the Alva Steamship Company, as owner of the steamer Bradley, and appellee Bartlett-Frazier Company, as owner of the cargo of 285,000 bushels of corn, each filed its libel against the Great Lakes Dredge & Dock Company in personam and against the tugs W. A. Field and North Harbor in rem, to collect damages suffered while the Bradley was being towed through the rock section of the Calumet river, on the morning of December 27, 1914. The Bradley was to be moved from an elevator in South Chicago up the Calumet river to its winter's berth.

Various acts of negligence, resulting in damages to appellees, were charged, and a decree entered against both appellants, which, however, because of the limited liability proceedings instituted by the owner of the tugs, was by stipulation restricted to $35,000 as against them. Damages to the steamer were fixed at $25,845.88 and to the cargo at $17,963.70.

Herman A. Kelly, of Cleveland, Ohio, and Chas. E. Kremer, of Chicago, Ill., for appellants.

Oscar D. Danson, of New York City, and Francis S. Laws, of Philadelphia, Pa., for appellees.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

EVANS, Circuit Judge. Was the evidence sufficient to establish the liability of either appellant to either or both appellees? This is the sole question for determination. Each appellant answers it in the negative, although admitting liability to both claimants, if any exists at all.

Very obviously the question presented by one appellant is quite different from that raised by the other. The owner of the tugs might be held, and the Great Lakes Dredge & Dock Company relieved from liability, or vice versa, the tugs might be entirely free from fault, and the dredging company guilty of negligence. The alleged negligent acts with which appellees charge the one are not necessarily connected with the facts upon which liability against the other is predicated. The claim of each appellant will therefore be separately considered.

[1] As to the appellant the Great Lakes Towing Company:

The Bradley was a large and valuable steel steamer, 460 feet long, with 52-foot beam, in strange waters, seeking a berth for the winter. The towing company furnished the tugs and assumed the liability of a tug owner in a home port. The rule of liability in such a situation is too well recognized to require elaborate exposition. Winslow v. Thompson, 134 Fed. 546, 67 C. C. A. 470; Baltimore & Boston Barge Co. v. Eastern Coal Co., 195 Fed. 483, 115 C. C. A. 393; same case in District Court (The Murrell), 200 Fed. 826; Davidson Steamship Co. v. United States, 205 U. S. 287, 27 Sup. Ct. 480, 51 L. Ed. 764; The Margaret, 94 U. S. 494, 24 L. Ed. 146.

From these and other cases the rule is deducible that a master of a tug, undertaking to tow a vessel in a home port, is bound to know the proper and accustomed waterways and channels, the depth of water, and natural formation of the bottom, whether in its natural state or as changed by permanent excavation, and he is chargeable with notice of recently changed conditions, either in channels or harbors, if means of knowledge exist and are available to him.

[2] Guided by the rule thus announced, our inquiry into the towing company's liability becomes a mere quest for the facts.

After reaching the elevator the Bradley was loaded with corn. Desirous of "putting up" for the winter, the largest possible tonnage was sought. To ascertain what load it might safely carry, inquiry was made of the towing company, and the advice given that it could be loaded to a depth of from 18.2 to 18.3 feet. The vessel was thereupon filled until it settled in the water 17.2 feet forward and 18.1 feet aft. The channel of the river at the so-called rock section was not wide; its greatest width being 200 feet. On the day in question, which was clear and calm, two steamers were moored in this channel on the west bank.

The tugs proceeded with their load to a point opposite these steamers, when the Bradley was towed slightly to the east and her bow was run into the mud. The tugs then pulled her back, and she was again moved forward. Just as she passed the second steamer, her shipkeeper heard a grinding noise and saw dust blow out of her air wells. She was moved but a short distance when the tugs, upon signal, ceased pulling. Shortly thereafter the Bradley settled to the bottom, and it was found she had three large holes on the port side of her bottom, as well

as minor injuries; the largest hole having a diameter of 4 or 5 feet, the bottom being shoved up 2 feet. Divers testified that in the channel various boulders were found, some few months later; one being 16.6 feet from the surface. Another round and smooth one, 4 feet in diameter, stuck well out of the mud, while still another projected 5 feet above the mud. There was evidence tending to show that in the spring of the succeeding year at least 30 boulders or loose rocks were found; the top of each one being less than 21 feet from the water's surface. The river at this section had not been used by large boats prior to this time; the largest one drawing not more than 12 feet of water. On the day in question the water was approximately 1 foot below normal.

The District Judge, in locating the cause of the steamer's injury found "that the stranding was caused, as claimed by libelants, viz. by a movable boulder or boulders or rocks, and I reject the claim of respondents that it was caused by a projection of ledge rock." Our examination of the evidence causes us to reach the same conclusion. These facts appearing, and this finding having been reached, the burden was cast upon the towing company to overcome this prima facie case so made out against it. Consolidated Coal Co. v. Knickerbocker Steam Towage Co. (D. C.) 200 Fed. 840; The Mason, 249 Fed. 718, 161 C. C. A. 628; Burr v. Knickerbocker Towing Co., 132 Fed. 248, 65 C. C. A. 554.

Appellant attempted to meet its burden by introducing the government bulletins and charts running back for several years and showing the state of navigation at this point. It appears therefrom that extensive improvements were made by the government in 1908, when considerable dredging took place, with the result that in its bulletin No. 23 the government announced that "from 106th street to a point 660 feet above Torrence avenue there is a 22.7-foot depth and 200-foot width," etc. Admittedly this announcement covered the "rock section" of the river where the accident occurred, and the towing company confidently relied on this information thus appearing in the government's report.

But the government bulletin was in error. Not only was there less than 22 feet of water at this point, but the government was aware of it, and in the summer of 1914 contracted with the Great Lakes Dredge & Dock Company, the other appellant herein, to excavate mud and rock to a depth of 21 feet below Chicago city datum. The dredge company, pursuant to this contract, had been excavating in this rock section for several months prior to December 27th, and the towing company either knew or clearly should have known that the excavation work was in this narrow rock cut or rock section. Had the towing company made inquiry, it would have learned of the terms of this contract, which, made in the summer of 1914, expressly recited that the average depth of the water at this point was from 19 to 19.5 feet (from which 1 foot should be subtracted because of low water levels on this day); that the river was being redredged to get the 21 feet of water; that boulders were to be removed, and payment was specifically provided for those exceeding in size one cubic yard. In other words, the

contract referred to and the action of the dredge company furnished conclusive proof that the bulletin information was inaccurate in 1914.

It further appears that the barges of the dredge company daily passed the office of the towing company loaded with the material that had been excavated from the rock section. Appellant's excuse is that it understood the excavation work was being conducted farther up the river. But it could meet its duty when, and only when, it knew that which was ascertainable upon reasonable inquiry. Engaged in the important task of towing valuable boats, freighted with cargoes representing so large a sum, it was the duty of the master of the tug to know the condition of the river, its depth, the condition of the bottom, and all other facts reasonably ascertainable bearing upon the safety of navigation.

Nor was this all of the proof bearing on appellant's liability. It appears that the presence of boulders in the bottom of this part of the river some years before had been a matter of common knowledge, and well known to the master of one of the tugboats; that these boulders were at the bottom of the river on December 27th, unless they had been taken out when the river was previously dredged. Likewise the fact that no boat carrying more than 12 feet of water had ever passed this point prior to this date is most significant.

But it is unnecessary to pursue the discussion further. We agree with the District Court that the towing company is liable to the extent of the value of the tugs, to wit, $35,000, with interest.

[3] As to the Great Lakes Dredge & Dock Company:

Quite different are the facts and the rules governing liability applicable to this appellant. It contracted with the government to reexcavate the river bottom, and began its work in the fall of 1914, and completed its contract May 27, 1915. Its liability was predicated upon the claim that boulders were by it rolled in or turned over into the channel, and left in a position where resulting damage would occur to passing steamers, or that it was negligent in not removing the boulders before it suspended its work for the winter.

We find no evidence to support either theory. A finding that the dredge company left the bottom of the river more unsafe than when it began work must rest upon pure speculation. The written contract inferentially negatives such a conclusion, for it assumes that boulders larger than one cubic yard were at the bottom of the river, and that the average depth of the river was on the day in question from 18 to 18½ feet.

It appears from the testimony that there were various ways of determining the depth of the river after the dredging was completed, or as the work progressed. Some were obviously more reliable than others. The representative of the government and the dredge company adopted one that suited their purpose, which was to measure the cubic capacity of the material excavated. Another method was provided in the contract to determine the depth of the water, but it was to be applied when the contract was fully completed.

Some claim is made by appellee that, because the dredge company did not locate these boulders, liability is established; but we cannot

adopt such a test of liability in a case where the work is not completed. Had the dredge company by its operation reduced the water at any point or turned up the boulders, so as to make them more dangerous to navigation, liability would have been established. Huntley v. Empire Engineering Corporation, 211 Fed. 959, 128 C. C. A. 457; Consolidated Coal Co. v. Knickerbocker Steam Towage Co. (D. C.) 200 Fed. 840.

Such, however, is not the case at bar. Here the dredge company excavated some material, but, with its task uncompleted, suspended for the winter, leaving the river in no worse condition than when the work was begun.

In their libel as filed appellees charge the dredging company with liability because of five acts of negligence, herewith set forth in their own language.

"A. As to respondent the Great Lakes Dredge & Dock Company:

"1. In that they carelessly and negligently carried out their work in connection with the dredging and river improvement, in such a manner as to obstruct the channel.

"2. In that they failed to 'sweep' the channel and keep it free of boulders and obstructions.

"3. In that they negligently dropped and left in the channel boulders and other obstructions.

"4. In that they did not give notice to vessels of obstructions left and caused by the dredging operation.

"5. In that they did not promptly remove boulders and other material left in the channel."

As to charges 1, 3, and 4 there was, as we have heretofore stated, admittedly, a total failure of proof. As to the second and fifth allegations the liability of this appellant was affected, if not controlled, by its contract with the government. In fact, the pleader, appreciating the bearing which the contract had upon appellant's liability, especially called attention to the parts requiring care and precaution upon the part of the dredging company, by quoting various provisions therefrom. No contention is made, however, that appellant failed to meet each of the requirements thus enumerated. Its liability, therefore, must depend upon its alleged failure to re-excavate a strip in the rocky section sufficient for boats to travel, before suspending its work for the winter.

As bearing on this phase of the case, it is apparent that the amount of material removed before the season closed depended upon the weather. Obviously the work could not be completed in a week, nor in a month; nor could this "rock section" work be done by piecemeal. The contract called for an expeditious performance of the work, but we find nothing therein that required any part of the work to be completed before the winter weather caused a suspension of operations. Under the circumstances disclosed in this case, we conclude that negligence on the part of the dredging company has not been established, and the libel as to it should have been dismissed.

The decree is reversed, with costs, as to the Great Lakes Dredge & Dock Company, and with directions to dismiss the libel as to this appellant. As to the Great Lakes Towing Company, the decree is affirmed, with costs.